No. 22462.

LESLIE A. GROSS *v.* WALDEMAR S. APPELGREN, ET UX., ET AL., AND METROPOLITAN INDUSTRIAL BANK, A COLORADO CORPORATION, THE TAPPAN CO., S. J. CULBERTSON, AND ISAAC H. KAISER.

(467 P.2d 789)

Decided January 19, 1970.    Rehearing denied May 4, 1970.

8

MICHAEL B. LAVINSKY, for plaintiff in error.

B. F. NAPHEYS III, for defendants in error Waldemar S. Appelgren, et ux., et al.

BEN KLEIN, for defendant in error Metropolitan Industrial Bank.

GORSUCH, KIRGIS, CAMPBELL, WALKER and GROVER, LEONARD M. CAMPBELL, JOHN J. MULLINS, JR., for defendants in error The Tappan Company and S. J. Culbertson.

WALTER L. GERASH, JOSEPH SAINT-VELTRI, for defendant in error Isaac H. Kaiser.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

THIS lawsuit, which was instituted by forty-eight plaintiffs to rescind twenty-four contracts for the purchase of kitchen equipment and to cancel and return the purchase money notes and mortgages, is here on a writ of error

to review a judgment in the amount of $42,055.09 awarded by the court, without the intervention of a jury. The judgment in favor of the plaintiffs provided for rescission and several money judgments against Leslie A. Gross, Manufacturers' Advertising Agency, Inc. (MAA), Rex Touzalin and Herb Carmel, defendants, and money judgments for corresponding amounts against the plaintiffs and in favor of the defendant Metropolitan Industrial Bank (the Bank). The purpose of the money judgments was to effect the rescission. Consequently, the money judgments against Gross were in the identical amounts as the money judgments in favor of the Bank. The court permitted the Bank to recover on the theory that it was a holder in due course, but enjoined the Bank from foreclosing on the real estate mortgages securing the notes because of the fraud of Gross, MAA and its salesmen. Gross is the sole plaintiff in error and seeks reversal of the judgments against him. Plaintiffs, by cross-error, seek reversal of the Bank's judgments against them.

Gross and I. H. Kaiser, law partners, organized and owned MAA and transacted the business through it out of which the litigation arose. Both Kaiser and MAA were defendants in the action, Gross owning two-thirds and Kaiser one-third of the corporate defendant; Gross was president and a director, and Kaiser was secretary-treasurer and a director. At the time this lawsuit was instituted, MAA was insolvent. The complaint named fourteen defendants. Other defendants will be mentioned only to the extent necessary to furnish sufficient background for an understanding of the facts, issues and basis for the trial court's disposition of the case.

The forty-eight plaintiffs were twenty-four married couples who had purchased Tappan electronic ranges and Tappan "Fabulous 400" electric ovens from MAA under substantially identical circumstances. One of the plaintiffs is now deceased. Decedent and his wife both signed the documents in issue and owned their home in joint tenancy. Their rights and liabilities in the property,

the transactions and the judgment herein were joint and several.

Although there was conflict in the evidence on some issues, in general the issues decided here are based upon the facts as found by the trial court or facts admitted by the party adversely affected by the judgment of this court. It should be noted that there is substantial evidence to support the findings of fact.

We disagree with the conclusion of law by the trial court that the Bank was a holder in due course. It was this conclusion which resulted in the court awarding the offsetting judgments.

Gross assigned five errors by the trial court in support of his argument for a reversal of the judgment. One relates to the insufficiency of the evidence to support a finding of fraud. The record amply supports the trial court on this point.

The second assignment is that the plaintiffs, by making from one to four payments on their notes, ratified the transactions. The payments were made to the Bank under threat of foreclosure of the mortgages on their homes. Under the circumstances and in view of the trial court's finding that the payments did not constitute ratification, the plaintiffs were not precluded from thereafter rescinding the transactions. *Holland Furnace Co. v. Robson,* 157 Colo. 347, 402 P.2d 628; *Bankers Trust Co. v. International Trust Co.,* 108 Colo. 15, 113 P.2d 656.

Third, Gross objected to the admission of certain evidence for want of sufficient foundation. An examination of the record fails to disclose such error.

As a fourth ground for reversal, Gross claims that "the judgment and order of rescission do violence to basic principles of logic, reason and fairness." As to this argument our answer will have to be gathered from the context of the opinion.

Because of the disposition we make of the case, our primary concern is with the issue raised by Gross (in his fifth assignment of error) and by the plaintiffs as to

the correctness of the trial court's holding that the Bank was a *holder in due course,* as contemplated by C.R.S. 1963, 95-1-52.

To be a holder in due course the instrument must have been taken without notice of any infirmity in the instrument or defect in the title of MAA. Under the Negotiable Instrument Law the title of an instrument is defective when it or the signature thereto is obtained by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when the holder negotiates it in breach of faith, or under such circumstances as amount to a fraud. C.R.S. 1963, 95-1-55. To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating it, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, *or knowledge of such facts that his action in taking the instrument amounted to bad faith.* C.R.S. 1963, 91-1-56.

A review of the evidence will show that under the law the Bank is not a holder in due course.

MAA was incorporated on January 14, 1963, to purchase the assets and business of Regal Management. Regal was engaged in the retail sale of Nu-Tone intercommunication equipment for homes on the *referral plan* to selected prospects. All but $50 of the $6,500 Regal purchase price was furnished by the Bank.

On February 13, 1963, MAA agreed in writing to sell to the Bank the secured notes arising out of MAA's sales of equipment to its customers. The Bank required the notes to be secured by real estate mortgages. Consequently, prospects for the sale of MAA's equipment were developed solely from lists of homeowners.

In March 1963, MAA arranged to buy Tappan electronic and conventional ranges for resale by means of the *referral plan.* Both the Tappan Company and its Colorado sales representative were defendants, but the trial court dismissed the claims against both defendants. At the instance and for the protection of Tappan, MAA gave

John P. McGuire and Company a security interest, to the extent of the purchase price, in all Tappan equipment while stored in MAA's warehouse. MAA's financial condition was such that it could not pay the purchase price to Tappan until it received the proceeds of the purchasers' notes from the Bank. Tappan demanded security for this interim or "float period." To secure Tappan during the "float period" the Bank guaranteed MAA's obligation.

When the notes were transferred by MAA to the Bank it paid MAA the amount of each note less an amount representing "add on" interest at 8% per annum for four years, which was called "time differential."

It is also undisputed that Gross and Kaiser were attorneys for the Bank prior to the organization of MAA and during its existence; that a Mr. Lederman, the chief executive officer of the Bank, had general knowledge of the sales method employed by MAA; that the Bank dealt exclusively with MAA in connection with the acquisition of the notes, having no contact of any type with the makers (plaintiffs) prior to the endorsement of the notes by MAA to the Bank.

All transactions between Manufacturers and the plaintiff couples were consummated from June through September 1963. Manufacturers' employees developed prospective customers from lists of homeowners and those who had satisfactory credit ratings. Prospects were invited to Manufacturers' sales offices for a demonstration of the Tappan "Fabulous 400" range and Tappan Electronic range. Immediately following the demonstration the prospects, by couples, were taken to a separate sales or "pitch room" where a sales representative made the presentation embodying the fraudulent representations which formed the basis for the rescission of the purchase contracts by the trial court.

After witnessing the demonstration and being subjected to the sales *pitch,* the plaintiffs signed a commission agreement, a modernization note and mortgage, a purchase order, a credit application, and, after installa-

tion, a completion certificate which they thought was a receipt for the equipment. Each couple was then given three *Five Hundred Dollar Certificates.*

The Modernization Note and Mortgage signed by each couple contained the following clause:

"As security for the payment of the above Note, the Makers hereby mortgage unto the Payee, successors and assigns, the following described real property known and numbered as _____._____in the City of _____, County of _____._____and State of Colorado, and warrant the title to the same, subject to any existing encumbrances now of record:

_____ "

The blanks were not filled in at the time of execution of the instrument. Those who at first refused to sign because it appeared to be a mortgage on their homes were assured that such was not the case; that the serial numbers on the cooking equipment would be used in the space provided for the description of "real property" after its installation in their homes. Others testified that the salesman hurried them so that they did not have an opportunity to read the documents; that it wasn't necessary anyway because the documents didn't mean anything, and that the signing was "a mere formality."

When the documents were finally completed by MAA, the street address of the purchaser's home was inserted in the first blank space and the legal description on the bottom line following "existing encumbrances now of record." The plaintiffs learned for the first time that their homes were encumbered when, sometime later, the Bank notified them that it had purchased the notes from MAA.

MAA agreed to pay an enrollment commission of One Hundred Dollars for each family whose name and address was submitted "by the program members" to MAA *"who are placed on the same program."* To be qualified for the *program,* a family had to *"own* or be buying their home, have *adequate* available income to support their mem-

bership on the program, and have *acceptable credit."* (Emphasis added.)

Each of the plaintiff couples, in order to earn enrollment commissions, (1) gave MAA lists of prospects, and (2) invited friends and neighbors to their homes for demonstrations of the Tappan equipment. The home demonstrations were conducted by a representative of MAA. Although the names of the invitees, together with the names of other prospective members of "the plan," were submitted by plaintiffs to MAA, none of the plaintiffs' accounts was credited with commissions. As part of the contract each purchaser received three Five Hundred Dollar certificates. These were complementary to the Commission Agreements. Among other provisions, this instrument provided that, when accompanied by fifteen rejection notices issued by MAA, it would be redeemed at the office of MAA for Five Hundred Dollars. The program members (purchasers) could submit to MAA names and addresses of families they considered to be bona fide prospective program members, and MAA, at its election, *"may"* contact these families and arrange to demonstrate and present the program to them. The certificate further provided that MAA "shall give the program members a rejection notice or commission check, as may be appropriate, in respect to each family to whom the program is fully demonstrated and presented."

The trial court found that Gross, Touzalin, Carmel and others met frequently between April 1960 and August 1963, "to review and revise their sales presentation, with the purpose of making a more effective deception of prospective purchasers. They would listen to presentations in progress and also to a taped presentation of a sales 'pitch' by Herb Carmel, all of which contained the false representations heretofore set out. They would agree as to which 'line' was most convincing and revise the presentation accordingly."

Some, but not all, of the deceptive and false representations found by the court to have induced the plaintiffs

to enter into purchase contracts were, (1) that the equipment could not be purchased in the open market or from another dealer; (2) that the referral plan was the *only* available method of purchase; (3) that the equipment could not be bought on a cash basis; (4) that to obtain the equipment the offer had to be accepted on the night of the demonstration; (5) that the equipment was available to the customer for demonstration purposes only and that it would be free to the customer; (6) that the customer would be under no legal obligation; (7) that there would be no mortgage on the purchasers' homes; (8) that "real property" on the *Modernization Note and Mortgage* referred to the Tappan equipment; (9) that on the basis of past experience from five to eight of the ten families who would view future demonstrations in the plaintiffs' homes would buy; and (10) that Tappan was behind the referral plan all the way and had adopted this method of distribution "to save the advertising expense."

On conflicting testimony the trial court found that the Bank did not have actual knowledge of the fraud surrounding the execution of the notes. It is undisputed, however, that on several occasions Mr. Lederman visited the offices of MAA when pre-sale demonstrations were being given and when sales presentations were being made. He denied that he overheard the representations which were made to the prospective purchasers. There was also testimony to the effect that the entire sales plan was explained to Mr. Lederman, which he also denied. However, he did admit that he knew MAA would pay the purchasers a "bird dog" fee, which he defined as a commission for referring other purchasers to MAA.

██ Tests other than "actual knowledge" may be used in resolving the issue of whether an endorsee of a promissory note is a holder in due course. Where the trial court has made no finding one way or the other on a particular question, this court may determine pure questions of law when it is warranted and supported by

a record which could produce no other result. *Klutts v. Parker,* 158 Colo. 594, 409 P.2d 275.

Thus, the question to be resolved is whether, under the facts set out above, the Bank was a holder in due course of the several notes of the plaintiffs, and, therefore, not subject to the defense of fraud interposed by the plaintiffs; or, did the Bank not attain the status of a holder in due course because of its close relationship to the nominal payee and the transactions out of which the notes came into existence? In other words, did this close relationship establish, as a matter of law, a situation where it must be said that the Bank should be treated as a participant in the transactions and subject to all defenses which could be interposed against the original payee.

This precise question has not heretofore been answered by this court. However, one of the leading cases on the point is cited in the plaintiffs' and Gross' brief. *Commercial Credit Co. v. Childs,* 199 Ark. 1073, 137 S.W.2d 260. *Childs* is cited and followed in many jurisdictions. The basic law which it enunciated is stated in this short quotation from the opinion:

"We think appellant was so closely connected with the entire transaction or with the deal that it can not be heard to say that it, in good faith, was an innocent purchaser of the instrument for value before maturity. * * *"

In 53 Harv. L. Rev. 1200, in a case note on *Childs, supra,* we find this cogent comment:

"By abandoning the test of the 'white heart and the empty head' in the case of the transferee who is more like an original party to the transaction than a subsequent purchaser, this decision increases the protection afforded the consumer who has not received what he was promised. * * * The holding is desirable in that it shifts the risk of the dealer's insolvency to the party better able to bear it. And since holders in due course from the finance company will be protected, the decision does not clog negotiability."

18

Another of the more frequently cited cases is *Commercial Credit Corporation v. Orange County Machine Works*, 34 Cal.2d 766, 214 P.2d 819. The basic facts, although different in detail, are similar to those here. It relied on *Childs, supra.* It stated the rule in this language:

"When a finance company actively participates in a transaction of this type from its inception, counseling and aiding the future vendor-payee, it cannot be regarded as a holder in due course of the note given in the transaction and the defense of failure of consideration may properly be maintained. Machine Works never obtained the press for which it bargained and, as against Commercial, there is no more obligation upon it to pay the note than there is to pay the installments specified in the contract."

In *Unico v. Owen*, 50 N.J. 101, 232 A.2d 405, the court said:

"In the field of negotiable instruments, good faith is a broad concept. The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would seem to follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving, credit-extending commercial world."

Under facts substantially similar to those here, the New Jersey court denied the status of a holder in due course,

"* * * where the financer maintains a close relationship with the dealer whose paper he buys; where the financer is closely connected with the dealer's business operations or with the particular credit transaction; or where the

financer furnishes the form of sale contract and note for use by the dealer, the buyer signs the contract and note concurrently, and the dealer endorses the note and assigns the contract immediately thereafter or within the period prescribed by the financer. * * * "

In support of the rule, the New Jersey court cited the following cases: *Industrial Credit Company v. Mike Bradford & Company.,* 177 So.2d 878 (D.C. App. Fla. 1965); *International Finance Corporation v. Rieger,* 272 Minn. 192, 137 N.W.2d 172 (1965); *Local Acceptance Company v. Kinkade,* 361 S.W.2d 830 (Sup. Ct. Mo. 1962); *Mutual Finance Co. v. Martin,* 63 So.2d 649, 44 A.L.R. 2d 1 (Sup. Ct. Fla. 1953); *Commercial Credit Corp. v. Orange County Mach. Wks.,* 34 Cal.2d 766, 214 P.2d 819 (1950); *Commercial Credit Co. v. Childs,* 199 Ark. 1073, 137 S.W.2d 260, 128 A.L.R. 726 (1940). See, also: *American Plan Corp. v. Woods,* 16 Ohio App. 2d 1, 45 Ohio Op. 2d 2, 240 N.E.2d 886; and Article by Professor Grant Gilmore, 63 Yale Law Review 1057, "The Commercial Doctrine of Good Faith Purchase."

We hold that the Bank was so closely connected with the entire transaction that it cannot be heard to say under the circumstances here that it, in good faith, was a holder in due course of the several notes of the plaintiffs. But for the Bank's participation in the whole transaction from the inception of MAA to its bankruptcy, the fraudulent acquisition of the notes could not have been accomplished. If the Bank did not have actual knowledge of all of the fraudulent misrepresentations made by the representatives of MAA, it most assuredly had knowledge of sufficient facts that its action in taking the instruments amounted to bad faith. C.R.S. 1963, 95-1-56. *Unico v. Owen, supra; Mutual Finance Co. v. Martin, supra; Commercial Credit Corp. v. Orange County Machine Works, supra; Commercial Credit Co. v. Childs, supra; American Plan Corp. v. Woods, supra.*

Accordingly, we affirm the judgment of rescission entered by the trial court and its judgment declaring

the real estate mortgages void. The several money judgments in favor of the plaintiffs and against Gross, Carmel, Touzalin and Manufacturers' Advertising Agency, Inc., and the money judgments in favor of the Bank and against the several plaintiffs are reversed. The cause is remanded to the trial court for the entry of judgments in favor of the several plaintiffs and against the Bank for the amounts of the several installment payments made to the Bank by the plaintiffs and each of them (see Order of May 2, 1966), and for such further proceedings and orders as may be necessary to effect the the rescission and carry out the mandate of this court. The judgments dismissing the claims of the plaintiffs against Kaiser, The Tappan Company and S. J. Culbertson are affirmed.

MR. JUSTICE PRINGLE dissents.

MR. JUSTICE GROVES does not participate.