[S.F. No. 23465. Jan. 6, 1977.]

JESSIE KING et al., Plaintiffs and Appellants, v.
CENTRAL BANK, Defendant and Respondent.

**COUNSEL**

James R. McCall and Robert A. Goldstein for Plaintiffs and Appellants.

Raymond J. Leonardini, Armando Albert Zavala, Joseph Garcia, Richard G. Fathy, Daniel M. Luevano, Rosalyn M. Chapman, John E. McDermott, Patricia M. Tenoso, Cary S. Reisman and Toby Rothschild as Amici Curiae on behalf of Plaintiffs and Appellants.

Roy C. Zukerman, C. Robert MacKay, Severson, Werson, Berke & Melchior, James B. Werson, D. Ronald Ryland and Jan T. Chilton for Defendant and Respondent.

Feldman, Waldman & Kline, Jeffrey W. Shopoff and Jane S. Kumin as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**RICHARDSON, J.**—We consider the application of the Unruh Act (Civ. Code, § 1801 et seq.) and the federal Truth-in-Lending Act (TILA) (15 U.S.C. § 1601 et seq.) to certain aspects of the financing and sale of automobile insurance. According to the complaint herein, defendant Central Bank, National Association (Bank), is engaged in financing automobile insurance policies through its subsidiary, Coast Program, and defendant John P. Roberts Co., Inc. (Roberts). Roberts is a licensed broker engaged in selling insurance on credit under the name "State All Insurance." On January 15, 1973, plaintiffs allegedly purchased from defendants an automobile insurance policy on credit.

Plaintiffs' complaint contains two causes of action. The first, a class action brought under the Unruh Act, alleges a violation of the act's finance charge limitations (Civ. Code, § 1805.1) and its disclosure

requirements (*id.,* §§ 1803.2, subd. (c), 1803.3, subd. (a)). Asserting a material variance between the maximum legal finance charge permissible under the Unruh Act and that collected in the instant transaction, plaintiffs seek to recover the finance charges paid, and to enjoin defendants' allegedly unlawful practices. The second cause of action alleges various violations of TILA's disclosure provisions and seeks recovery of civil penalties and attorneys fees. (See 15 U.S.C. § 1640.)

Defendants demurred generally upon the ground that neither the Unruh Act nor TILA applied to the insurance transaction. Roberts' demurrer was overruled, and the merits of plaintiffs' action against Roberts are not presently before us. Bank's demurrer was ultimately sustained without leave to amend, and judgment of dismissal was entered in Bank's favor. Plaintiffs have appealed. As will appear, we have concluded that the complaint against Bank properly stated causes of action under both the Unruh Act and TILA.

■    Traditionally, in assessing the sufficiency of plaintiffs' complaint against a general demurrer, we treat the demurrer as admitting all material facts properly pleaded. (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541 [99 Cal.Rptr. 745, 492 P.2d 1137], 549; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) Further, in reviewing an order sustaining a demurrer without leave to amend, "the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties." (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 244-245 [74 Cal.Rptr. 398, 449 P.2d 462]; see also *Scott* v. *City of Indian Wells, supra*; *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 542 [343 P.2d 36]; *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 664 [297 P.2d 638]; Code Civ. Proc.; § 452.) Mindful of these two interpretive rules we examine the trial court's ruling as to plaintiffs' two causes of action.

1. *The Application of the Unruh Act*

The Unruh Act was enacted in 1959 for the purpose of correcting various abuses incident to the rapid and widespread growth of the consumer credit industry. (*Morgan* v. *Reasor Corp.* (1968) 69 Cal.2d 881, 889, 897-898 [73 Cal.Rptr. 398, 447 P.2d 638]; Comment (1970) 58 Cal.L.Rev. 210; Report of the Subcommittee on Lending and Fiscal Agencies, 2 Appendix to Assem. J. (1959 Reg. Sess.) p. 9.) The act proscribes a variety of unfair practices such as the unauthorized

alteration of retail installment contracts, the assessment of excessive finance charges, inadequate disclosure of information to consumers, and unfair garnishment and repossession practices. Violation of the act may result in the imposition of criminal penalties (Civ. Code, § 1812.6), forfeiture of finance or delinquency charges (*id.*, § 1812.7), and punitive damages (*id.*, § 1812.9).

The act applies to any "retail installment contract," which is defined as a contract for a retail installment sale between "buyer" and "seller" providing for either (a) repayment in installments, subject to a finance charge or other consideration, or (b) payment in four or more installments. (Civ. Code, § 1802.6.) "Seller" is defined as ". . . a person engaged in the business of selling goods *or furnishing services* to retail buyers." (*Id.*, § 1802.3, italics added.) The term "services" means ". . . work, labor and services, for other than a commercial or business use, *including services furnished in connection with . . . the providing of insurance, . . .*" (*Id.*, § 1802.2, italics added.) ▇▇ We conclude, as developed below, that, under the facts alleged in this case, Bank's furnishing of *financing services* in close connection with plaintiffs' installment purchase of automobile insurance may reasonably be construed to lie within the definition of "services" under section 1802.2 and, accordingly, may be subject to regulation under the act.

Initially, we note that a 1959 opinion of the California Attorney General had concluded that a loan to finance payment of insurance premiums was not a "service" under section 1802.2. (34 Ops.Cal.Atty. Gen. 288, 289 (1959).) While that opinion is entitled to "great respect" (*Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 751-752 [100 Cal.Rptr. 290, 493 P.2d 1154]), it is noteworthy that the opinion did not focus upon, indeed ignored, the language of section 1802.2 which defines "services" as including, specifically, "services furnished in connection with . . . the providing of insurance, . . ." Instead, the opinion emphasized that the Unruh Act was intended to apply only to transactions involving a retail installment contract executed between retail buyers and sellers. We are persuaded, however, by reason of the act's interlocking definitions of "retail installment contract," "seller," and "services," mentioned above, that it is at least arguable that an agreement to finance an automobile insurance policy through installment payments constitutes a "service" transaction covered by the act. As we stated in *Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881, in rejecting an attempt to construe narrowly the act's definition of "services": "Section 1802.2 clearly includes *all services*

provided for personal purposes, except for the specifically enumerated exceptions [not applicable here]; obviously we do not assume that the Legislature intended exceptions other than those it explicitly specified." (P. 888, italics added by court.)

Nevertheless, we need not, and do not, decide at this time whether the Unruh Act applies to all routine insurance *financing* transactions, for plaintiffs have alleged additional facts from which it reasonably may be inferred that defendant Bank actually engaged in *providing* insurance to them, conduct which would have fallen within the act's scope, by reason of the definition of "services" in section 1802.2. (We note, in passing, a 1967 opinion of the Attorney General which explains that the word "services" in that section would include providing the insurance policy itself, as well as providing collateral services in connection therewith. (50 Ops.Cal.Atty.Gen. 110 (1967).)) According to plaintiffs' complaint, both Bank and Roberts are "engaged in the retail sale of insurance for credit," and plaintiffs "purchase[d]" an insurance policy from them. Further, while the above may be conclusionary language, plaintiffs alleged in addition that Bank's financing activities in several significant respects were intimately linked with the insurance purchase transaction. Bank allegedly furnished broker Roberts, on a regular basis, with printed contract forms containing the terms which govern credit sales of automobile insurance. These forms bore the name and address of Bank, and among other things, provided (1) for a down payment of at least 20 percent of the cost of the insurance, a sum paid to Bank in consideration for financing the insurance premium; (2) for assignment of the policy to the Bank as security, with Bank retaining the right to cancel the policy in the event of nonpayment; and (3) for payment of installments directly to Bank, rather than to Roberts. In addition, plaintiffs alleged that Roberts regularly used these forms in its business, that it required purchasers of automobile insurance, such as plaintiffs, to finance their purchases through Bank, that Bank exercised substantial control over Roberts in determining which policies could be purchased on credit, and in establishing the terms of the policy and credit sale, that Roberts acted as a conduit for the placing of the installment contracts with Bank, and that Bank shared the profits from these contracts with Roberts and paid it a fee for all purchases procured by Roberts which met Bank's requirements.

The foregoing allegations, if proven, would support a finding that defendants Roberts and Bank were jointly engaged in the business of

"providing" automobile insurance within the meaning of section 1802.2. As we have previously observed, the legislative policy underlying the act is the protection of retail consumers from the documented abuses which plagued the consumer credit field. In the past we have acknowledged this protective policy and have repeatedly held that the act's provisions should be liberally construed to protect consumers, with a view toward expanding, rather than limiting, its coverage. (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 823 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881, 889.) In *Morgan,* for example, we reaffirmed the earlier rule (see *Coml. Credit Corp.* v. *Orange Co. Mach. Works* (1950) 34 Cal.2d 766 [214 P.2d 819]) that a "close connection" between the seller of goods and the finance company to which the installment contract is assigned may result in treating the finance company *as a party to the original transaction,* subject to those statutory restrictions applicable to such parties. We recently summarized the "close connection" rule in *Vasquez,* in the following manner: ". . . [I]t has long been settled in California that a financial institution may be denied the status of a holder in due course because of its close connection with the seller. [Citations.] In *Commercial Credit [supra]* we held that since the assignee of a contract and note advanced money to the seller with the understanding that these instruments would be assigned to it, supplied the contract forms to the seller, and actively participated in the transaction from its inception, it could not claim holder-in-due-course status." (4 Cal.3d at p. 822; see also *Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 924 [117 Cal.Rptr. 541, 528 P.2d 357] [". . . a finance company cannot shed the duties and responsibilities of a lender by accepting the assignment of contracts from a seller with which it is intimately connected."])

Bank points out that both the *Morgan* and *Glaire* cases involved a close connection between the finance company and the seller of goods. Stressing the fact that since the complaint herein failed to allege any relationship between itself *and the insurer* which actually issued the subject policy, Bank and its amici argue that Bank cannot thereby be deemed a "seller" of insurance. It notes that the parties to an insurance contract are the insurer and the insured only; that the complaint does not allege that Bank is the seller of the insurance; that if not a "seller" it cannot be subject to the Unruh Act; and that Bank's interest in the policy is that of a security holder at best. Yet, given the alleged close connection between Bank and broker Roberts, Bank's asserted direct role in arranging and supervising the transaction, and its alleged retention of

substantial control over, and interest in, the policy of insurance, we conclude that the complaint adequately alleged facts from which the trier of fact might reasonably infer that Bank "provided" insurance within the meaning of section 1802.2 of the Unruh Act.

We do not ignore the fact that plaintiffs attached as an exhibit to their complaint a copy of an agreement between them and Bank which agreement on its face, purports to be a loan instrument rather than an installment purchase contract. The agreement, an "Insurance Premium Financing Installment Note, Security Agreement and Disclosure Statement," provides among other things that the "borrower" promises to pay Bank a specified sum in installments, in consideration of Bank's payment of the insurance premiums, and that the borrower assigns to Bank as security for that promise the policy together with all rights to cancel the policy and all proceeds or return premiums due or to become due thereunder. ▪ In determining the application of consumer protection laws to particular transactions, we have said that ". . . we must look to the substance of the transaction and not allow mere form to dictate the result." (*Glaire* v. *La Lanne-Paris Health Spa, Inc., supra,* 12 Cal.3d 915, 925; see *Thomas* v. *Wright* (1971) 21 Cal.App.3d 921, 924-925 [98 Cal.Rptr. 874] ["lease" held to be conditional sales contract].) Plaintiffs herein have alleged sufficient facts indicating that, despite the form of the transaction as a "loan" of money from Bank to plaintiffs, the substance thereof was an installment sale of automobile insurance.

Defendant Bank, however, observes that the business of insurance premium financing is independently regulated by the provisions of the Insurance Premium Financing Act (Fin. Code, § 18900 et seq.). Bank suggests that the Legislature would not have intended both this act and the Unruh Act to control such transactions. Yet the provisions of the Insurance Premium Financing Act apply only to those companies organized and qualified to act as "premium finance agencies." (See Fin. Code, §§ 18003.1, 18904, 18930.) Banks and other traditional lending institutions are not governed by these provisions. (See Stats. 1965, ch. 1629, § 8, p. 3725, reported as an "historical note" in West's Fin. Code Ann., § 18930, p. 486.) Accordingly, the acceptance of Bank's contention in this regard would render the financing aspects of the present transaction unregulated by either act.

▪ For all of the foregoing reasons, we conclude that the allegations of plaintiffs' complaint, taken together with those inferences reasonably

drawn therefrom, state a cause of action against Bank under the Unruh Act, permitting plaintiffs to go to trial.

### 2. *The Application of TILA*

As indicated above, plaintiffs have also alleged, in their second cause of action, that defendant Bank violated TILA, a federal consumer protection act requiring disclosure of specified information to consumers in various commercial transactions. In particular, it is alleged that the contract between the parties failed to specify the "cash price," "unpaid balance of cash price," or "deferred payment price," as those terms are used in the federal regulations (see 12 C.F.R. § 226.8(c)), and that the contract failed to set forth adequately the penalty in the event of prepayment (see 12 C.F.R. § 226.8(a)(6)). Plaintiffs seek to recover statutory penalties and attorneys' fees, as provided in TILA (see 15 U.S.C. § 1640).

TILA distinguishes between "consumer credit sales" and "consumer loans" (see 15 U.S.C. § 1602, subds. (f), (g)). The regulations upon which plaintiffs rely, and which Bank allegedly violated, pertain only to credit sales, and not to consumer loans. (Other disclosure requirements, not at issue herein, are applicable to consumer loans; see 15 U.S.C. § 1639.) The question before us is whether plaintiffs have alleged sufficient facts from which it may be inferred that defendant Bank participated in a credit sale within the meaning of TILA.

"Credit sale" is defined by TILA as ". . . any sale with respect to which credit is extended or arranged by the seller . . . ." (15 U.S.C. § 1602, subd. (g).) We conclude that, by reason of plaintiffs' allegations regarding the nature of Bank's participation in the sale of insurance to plaintiffs, and Bank's close connection with defendant Roberts in procuring insurance for plaintiffs, as set forth in section 1 hereof, plaintiffs have adequately alleged facts disclosing a "credit sale" by bank within the meaning of TILA.

In *Glaire* v. *La Lanne-Paris Health Spa, Inc., supra,* 12 Cal.3d 915, 925, we reviewed the obligations of an assignee finance company whose close relationship with the seller led us to treat it as "the extender of consumer credit which the seller has merely arranged." (*Id.*) Similarly, in *Stefanski* v. *Mainway Budget Plan, Inc.* (5th Cir. 1972) 456 F.2d 211, the federal court found TILA's credit sales disclosure requirements applicable

despite the *form* of the transaction as a cash sale of automobile insurance followed by an assertedly "independent" loan to finance the premium. The court explained that plaintiff should be permitted to prove a close relationship between the seller and lender which might establish a credit sale in substance. (P. 212; see also *Mourning* v. *Family Publications Service, Inc.* (1973) 411 U.S. 356, 365 [36 L.Ed.2d 318, 327, 93 S.Ct. 1652]; *Joseph* v. *Norman's Health Club, Inc.* (8th Cir. 1976) 532 F.2d 86, 90-93.) Although the foregoing cases involve varying factual situations, and are not directly on point herein, their underlying rationale would readily support plaintiff's position that Bank participated in a credit sale under TILA.

Defendant Bank relies upon *Manning* v. *Princeton Consumer Discount Co., Inc.* (3d Cir. 1976) 533 F.2d 102, but that case is not persuasive. In *Manning,* an automobile dealer sold plaintiff a car and arranged financing with a commercial lender. The lender made the appropriate disclosures required by TILA for a "consumer loan," but neither the dealer nor the lender disclosed the requisite "credit sale" information. The court held that it was the dealer's obligation to furnish this information, and that, for the sake of avoiding multiple disclosures of identical information, the lender would be excused from this responsibility. In the present case, it does not appear from the complaint whether or not plaintiffs ever received the appropriate credit sale disclosures. Furthermore, in *Manning, supra,* at page 106, footnote 4, no "close connection" was alleged to exist between the financing entity and the seller or the sales transaction.

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., and Clark, J., concurred.

**MOSK, J.**—I concur, and agree completely with Justice Richardson's opinion.

Since Bank relies on a 1959 opinion of the Attorney General, issued during my tenure in that office (34 Ops.Cal.Atty.Gen. 288), I am for a second time in the same predicament as Mr. Justice Jackson in *McGrath* v. *Kristensen* (1950) 340 U.S. 162, 176 [95 L.Ed. 173, 184-185, 71 S.Ct. 224]. (See *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 646 [63 Cal.Rptr. 391, 433 P.2d 183].) Ten years before, as Attorney General of the United

States, Justice Jackson had rendered an opinion contrary to the conclusion he reached as a justice of the Supreme Court. He offered an explanation which I adopt, in substance, as my own:

"I concur in the judgment and opinion of the Court. But since it is contrary to an opinion which, as Attorney General, I rendered in 1940, I owe some word of explanation. 39 Op.Atty.Gen. 504. I am entitled to say of that opinion what any discriminating reader must think of it—that it was as foggy as the statute the Attorney General was asked to interpret. . . . Precedent, however, is not lacking for ways by which a judge may recede from a prior opinion that has proven untenable and perhaps misled others. See Chief Justice Taney, *License Cases,* 5 How. 504, recanting views he had pressed upon the Court as Attorney General of Maryland in *Brown* v. *Maryland,* 12 Wheat. 419. Baron Bramwell extricated himself from a somewhat similar embarrassment by saying, 'The matter does not appear to me now as it appears to have appeared to me then.' *Andrews* v. *Styrap* [Eng.] 26 L.T.R.(N.S.) 704, 706. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: 'My own error, however, can furnish no ground for its being adopted by this Court. . . .' *United States* v. *Gooding,* 12 Wheat. 460, 478. Perhaps Dr. Johnson really went to the heart of the matter when he explained a blunder in his dictionary—'Ignorance, sir, ignorance.' But an escape less self-depreciating was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: 'I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion.' If there are other ways of gracefully and good naturedly surrendering former views to a better considered position, I invoke them all."

I also find appropriate the quotation employed by Mr. Justice Rutledge in *Wolf* v. *Colorado* (1949) 338 U.S. 25, 47 [93 L.Ed. 1782, 1795, 69 S.Ct. 1359]: " 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' "