Richard L. and Theresa M. MEYERS,
etc., Appellants,

v.

POSTAL FINANCE COMPANY et
al., Respondents.

No. 49274.

Supreme Court of Minnesota.

Dec. 7, 1979.

Head & Truhn, Jerome Truhn, and Thomas V. Seifert, Minneapolis, for appellants.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Thomas P. Kane, Edward M. Laine, Carol J. Grant, and Paul R. Hannah, St. Paul, for respondents.

Heard before PETERSON, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

Plaintiffs, as members of the United Buyers Union of California, Inc. ("UBU"), brought a class action against Postal Finance Company and Postal Thrift Loans, Inc., ("Postal") in September, 1975. Plaintiffs assert that Postal should be held affirmatively liable for the alleged fraudulent acts and deceptive practices of UBU on several theories: Postal's status as the assignee of contracts entered into between plaintiffs and UBU makes Postal affirmatively liable on these contracts; Postal and UBU were engaged in a joint venture; and Postal and UBU were so closely connected that Postal should be regarded as a party to the sales of UBU memberships. Plaintiffs also assert that Postal is independently liable to them under the Prevention of Consumer Fraud Act, Minn.Stat. §§ 325.78–80 (1978).

The case was tried in Hennepin County District Court in May, 1978. At the close of plaintiffs' case the trial court directed a verdict against the plaintiffs on all of the above theories of liability. Plaintiffs appeal from the directed verdict and from the trial court's order denying a new trial.

Plaintiffs also challenge several of the trial court's evidentiary rulings. We affirm.

UBU began doing business in Minnesota in November, 1971. The theory behind such a buyers' club was that by aggregating their purchasing power, consumers could buy goods directly from manufacturers and thus avoid intermediary markups on their purchases.

Approximately two months prior to the time UBU began soliciting memberships in Minnesota, James Menning, president of UBU, came to Minnesota to arrange financing for the club by means of selling its installment membership contracts to finance companies. Lenny Olson, another principal of UBU, contacted M. G. Financial Services ("MG") to discuss the possibility of selling UBU membership contracts to MG. Sometime in the late fall of 1971, MG began purchasing UBU membership contracts from UBU. A contract between MG and UBU, effective November 15, 1971, was later signed. This contract did not obligate MG to purchase any UBU membership contracts but it did set out discount percentages for those contracts MG chose to purchase and gave MG full recourse against UBU.

In November, 1972, Postal acquired MG. Shortly thereafter, UBU contacted Postal about the purchase of UBU membership contracts. Postal did not purchase contracts from UBU until January 1973, because it was preoccupied with other business. Thereafter, Postal purchased contracts from UBU under procedures similar to those followed by MG. UBU salesmen obtained credit information from prospective members and filled out credit forms supplied by Postal. With this credit information, Postal made a preliminary decision whether to purchase the contract. If a contract was initially approved, Postal waited for the expiration of a three-day cooling off period and then contacted the applicant to verify that the applicant still wanted the contract and understood it.

Postal entered into a contract with UBU, similar to the one between MG and UBU, which governed the terms of Postal's purchases of UBU membership contracts. Postal was not obligated to purchase any UBU contracts under the agreement.

Testimony from several witnesses indicates that UBU misrepresented to them the discount percentages available on goods purchased through UBU. In addition, some listed merchandise was not available. Certain merchandise was not purchased directly from manufacturers, but instead was purchased at local discount houses by UBU employees. Free gifts offered at the time of joining UBU were never received. The service was often poor at the merchandise showroom.

Contacts between UBU and Postal personnel were frequent from the time Postal began purchasing UBU contracts. Postal employees regularly discussed complaints received from UBU members in the course of Postal's collections with UBU personnel. UBU relied heavily financially on the money it received from sales of membership contracts to Postal, but there is no evidence that Postal knew this. Generally, UBU would offer a contract first to Postal and then to another company if Postal rejected it. In early 1973, Postal purchased fewer and fewer UBU contracts because the applicants did not meet Postal's credit qualifications. When UBU questioned a Postal employee about this, the employee suggested that larger downpayments from the applicants would make them more satisfactory credit risks.

In May, 1973, UBU went out of business and informed Postal that it was doing so. The principals of UBU left Minnesota. Soon afterward, Postal agreed to stop collecting from UBU members. This action by plaintiffs, therefore, does not seek to prevent Postal from making further collections from plaintiffs on the contracts assigned to Postal by UBU; rather, it seeks to hold Postal affirmatively liable for the return of money paid by plaintiffs to Postal on those contracts in the past, and for money damages.

The following issues are therefore presented:

(1) Was the trial court correct in directing a verdict for defendant at the close of plaintiffs' case on the ground that plaintiffs had failed to present sufficient evidence on any of the proposed theories of liability?

(2) Did the trial court act within its discretionary authority in excluding some of plaintiffs' offered evidence?

1. At the time of trial, the parties to this action stipulated that Postal was not a holder in due course of negotiable instruments from UBU.[1] Postal's liability to plaintiffs must therefore originate in its status as an assignee of contracts from UBU on which plaintiffs are account debtors.

Generally, when contract rights are assigned, the assignee's right to collect under the contract from the account debtor (here, plaintiffs) is subject to those defenses, set-offs, and counter-claims which the account debtor could assert against the assignor. *See, e. g., First & Lumbermen's National Bank v. Buchholz*, 220 Minn. 97, 18 N.W.2d 771 (1945); *First National Bank v. Consolidated School District No. 28*, 184 Minn. 635, 240 N.W. 662 (1932). Minn.Stat. § 336.9–318(1) (1978) merely codifies this rule, and states in part:

> [T]he rights of an assignee are subject to
> (a) all the terms of the contract between the account debtor and the assignor and any defense or claim arising therefrom;

■ Thus, in the instant case, UBU's alleged fraud and deceptive practices would probably be a valid defense to any further collections under the contract by Postal. However, as noted above, Postal has ceased to collect on these contracts, and plaintiffs instead seek to hold Postal affirmatively liable for the return of money paid by plaintiffs on these contracts in the past and for money damages. The law in Minnesota, as in most jurisdictions, holds that the assignment of a contract does not impose upon the assignee the duties or liabilities imposed by the contract on the assignor in the absence of the assignee's specific assumption of such liabilities. *Pioneer Loan & Land Co. v. Cowden*, 128 Minn. 307, 150 N.W. 903 (1915); *Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 496 P.2d 1016 (1972); *Walker v. Phillips*, 205 Cal.App.2d 26, 22 Cal.Rptr. 727 (1962). Here, plaintiffs have introduced no evidence of an assumption by Postal of any of UBU's obligations or liabilities to plaintiffs on these contracts. Therefore, although UBU may have failed to perform on the contracts or made misrepresentations to plaintiffs, Postal is not consequently liable solely because of its status as an assignee.

Plaintiffs contend, as a second theory of liability, that UBU and Postal were engaged in a joint venture. As such, they should be held jointly liable for the debts of the venture.

■ Joint venture is a remedial status imposed by a court to hold a party responsible for the results of an enterprise over which the party has effective control even though it is not nominally responsible. In *Rehnberg v. Minnesota Homes, Inc.*, 236 Minn. 230, 52 N.W.2d 454 (1952), this court stated that a joint adventure is created when two or more persons combine their money, property, time, or skill in a particular business enterprise and agree to share jointly, or in proportion to their respective contributions, in the resulting profits and, usually, in the losses. We further held that:

> [A]n enterprise does not constitute a joint adventure unless each of the following four elements are present, namely:
> (a) *Contribution*—the parties must combine their money, property, time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature.
> (b) *Joint proprietorship and control* —there must be a proprietary interest and right of mutual control over the sub-

---

**1.** UBU did not request its members to sign a negotiable instrument as that term is defined in Minn.Stat. § 336.3–104(1)(b) (1978). And under Minn.Stat. § 336.3–305 (1978), the holder in due course doctrine applies to one who takes an instrument, which is defined to mean a negotiable instrument by Minn.Stat. § 336.3–102(1)(e) (1978).

ject matter of the property engaged therein.

(c) *Sharing of profits but not necessarily of losses* —there must be an express or implied agreement for the sharing of profits (aside from profits received in payment of wages as an employee) but not necessarily of the losses.

(d) *Contract*—there must be a contract, whether express or implied, showing that a joint adventure was in fact entered into.

236 Minn. 235, 52 N.W.2d 457 (citations omitted).

■ In this case, Postal provided UBU with cash, but only as an incident to its business of purchasing and holding discounted commercial paper; Postal contributed money only in the sense that every buyer contributes money to a seller. This is not sufficient to satisfy the contribution requirement. As to joint proprietorship and control, the most that can be inferred from the evidence in plaintiffs' behalf is that Postal personnel were aware of some aspects of UBU's business. Regarding sharing of profits, Postal was to receive fixed payments from UBU members on their contracts, but UBU and Postal were in the positions of seller and buyer and Postal had no right to share in whatever profits UBU made. Finally, the only express contract between Postal and UBU governed the sale of UBU contracts to Postal once Postal decided to purchase a contract. But it did not obligate Postal to purchase any UBU contracts or to engage in any dealing with UBU. Nor does the course of dealing between Postal and UBU as established by plaintiffs' evidence indicate an implied contract between the parties to engage in a joint venture. Rather, the evidence shows that although Postal purchased a substantial number of UBU membership contracts over a period of time, Postal made a series of independent decisions whether to purchase each contract and was not bound to aid UBU in its buyers' club. The evidence here is simply insufficient to establish a joint venture.

■ As a third alternative basis of liability, plaintiffs assert that Postal was so closely connected to UBU that Postal effectively participated in UBU's transactions with plaintiffs and should be held affirmatively liable for UBU's alleged wrongdoing. The "close connection" doctrine is somewhat analogous to joint venture. It originated and still is predominantly used as a means of negating holder in due course status. Thus, in the first case to enunciate this doctrine, *Commercial Credit Co. v. Childs*, 199 Ark. 1073, 137 S.W.2d 260 (1940), the court held that a credit company, to whom a sales contract had been assigned by the seller of an automobile, was so closely connected to the seller that it could not rely on the defenses of a good faith purchaser and repossess the car. The court stated:

We think appellant was so closely connected with the entire transaction or with the deal that it can not be heard to say that it, in good faith, was an innocent purchaser of the instrument for value before maturity. It financed the deal, prepared the instrument, and on the day it was executed took an assignment of it from the Arkansas Motors, Inc. Even before it was executed it prepared the written assignment thereon to itself. Rather than being a purchaser of the instrument after its execution it was to all intents and purposes a party to the agreement and instrument from the beginning.

199 Ark. 1077, 137 S.W.2d 262. The close connection doctrine has been used to negate holder in due course status in Minnesota. *International Finance Corp. v. Rieger*, 272 Minn. 192, 137 N.W.2d 172 (1965).

In this case, the parties have stipulated that Postal was not a holder in due course. However, the close connection doctrine has been extended in a few cases beyond its use as a defense against a party who seeks to collect on an instrument and claims holder in due course status. It has been used affirmatively to rescind or cancel a contract held by the party so closely connected,[2] and

2. *E.g., Vasquez v. Superior Court*, 4 Cal.3d 800, 484 P.2d 964, 94 Cal.Rptr. 796, 484 P.2d 964

(1971); *Gross v. Applegren*, 171 Colo. 7, 467 P.2d 789 (1970).

to successfully sue for the return of value already paid to the closely connected party.[3]

■ Cases permitting affirmative use of the close connection doctrine against a closely connected party have been relatively few and are limited to several jurisdictions, including California,[4] Colorado, and ·Montana. Among these, even fewer have imposed affirmative liability for the return of money already paid to the closely connected party, as plaintiffs attempt to do in the instant case. An examination of this case in light of the various criteria which have been used in other cases to define a close connection (including cases in which the close connection doctrine was used defensively as well as those imposing affirmative liability) demonstrates that plaintiffs have not introduced sufficient evidence for a jury to find a close connection between Postal and UBU.

A contractual relationship between the assignor and assignee under which the assignee agrees to purchase all or a substantial part of the contracts sold by the assignor, or advance consultation between the parties before the assignor enters into particular contracts, have been held to be indicators of a close connection. *Gross v. Applegren,* 171 Colo. 7, 467 P.2d 789 (1970); *Commercial Credit Corp. v. Orange County Machinery Works,* 34 Cal.2d 766, 214 P.2d 819 (1950). In this case, Postal had no obligation to purchase any UBU contracts. The contract between Postal and UBU only set out procedures to be followed if Postal did purchase a contract. UBU sold contracts without first determining whether Postal would buy them, and if Postal did not, UBU sold them to other financing companies. Postal determined whether or not to accept assignments of UBU contracts based on its own credit criteria.

Other criteria for a close connection were not met. Postal had nothing to do with the preparation of UBU's contract forms, nor were there automatic or contemporaneous assignments of contracts. Credit requirements were not imposed by the assignee to determine which potential buyers could become members of UBU. There was no common control or management of UBU and Postal. Postal had some knowledge of UBU's business practices, but UBU employees attempted to present a favorable impression of their business to Postal.

Plaintiffs' evidence would not justify a finding of a close connection between UBU and Postal. Instead, the evidence demonstrates entities which conducted their business and made decisions separately. They had regular dealings with each other as assignor and assignee of UBU's contracts, but that is not sufficient to establish a close connection as the courts have defined it.

■ Finally, plaintiffs contend that Postal is liable to them independently of UBU's misconduct, under Minn.Stat. §§ 325.78–·325.80 (1978), the Prevention of Consumer Fraud Act. Minn.Stat. § 325.79, subd. 1, provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has. in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Plaintiffs contend that Postal violated this statute by continuing to accept assignments of UBU contracts and collect on these contracts even though it knew that UBU could not perform on the contracts. There is no evidence that Postal knew ·of

---

3. *Massey-Ferguson Credit Corp. v. Brown,* 169 Mont. 396, 547 P.2d 846 (1976), and Mont., 567 P.2d 440 (1977).

4. Among the California cases cited by plaintiffs, two primarily involve a construction of the Unruh Act, a California consumer protec-

tion statute, and are not persuasive authority for affirmative liability in the context of this case. *King v. Central Bank,* 18 Cal.3d 840, 135 Cal.Rptr. 771, 558 P.2d 857 (1977); *Morgan v. Reasor Corp.,* 69 Cal.2d 881, 73 Cal.Rptr. 398, 447 P.2d 638 (1968).

UBU's alleged nonperformance. UBU did function as a buyers' club throughout its existence. Some complaints were made to Postal about UBU, but Postal ceased collections in such cases until the problems were resolved.

Postal also cannot be held affirmatively liable as an assignee for UBU's alleged fraud under this section. The liability of an assignee is limited by Minn.Stat. § 325.79, subd. 2(4):

> With respect to a sale or lease in violation of this section an assignee of the rights of the seller or lessor is subject to all claims and defenses of the buyer or lessee against the seller or lessor arising out of the sale or lease notwithstanding an agreement to the contrary, but the assignee's liability under this section may not exceed the amount owing to the assignee at the time the claim or defense is asserted against the assignee. *Rights of the buyer or lessee under this section can only be asserted as a matter of defense to or set off against a claim by the assignee.* [Emphasis added.]

Plaintiffs argue, however, that this statute was superseded by Minn.Stat. § 325.907, subd. 3a, which creates a civil action for damages for violations of, *inter alia*, the Consumer Fraud Act. Previously, only injunctive remedies were available under the Act.

Contrary to plaintiffs' implication, the availability of damages as a remedy does not negate the limited nature of an assignee's liability without an express legislative intent to rescind the limitation. No such legislative intent is expressed, and therefore the liability of an assignee under this Act should be limited by § 325.79, subd. 2(4).

2. Plaintiffs challenge many of the trial court's exclusionary rulings on plaintiffs' evidence. The trial court sustained objections to several offers of evidence relating to UBU's wrongful conduct. Some of the objections were based on relevancy and others on hearsay grounds.

Defendant correctly points out that some of the evidence originally excluded on relevancy grounds was later admitted into evidence by the trial court in the form of another witness' testimony. Other evidence, however, was not admitted.

■ It is apparent from reading the transcript of the trial that the court was disturbed by plaintiffs' repeated attempts to prove the details of UBU's wrongdoing without first establishing that Postal was sufficiently linked with UBU. UBU is not a party to this action, and therefore its wrongful conduct is irrelevant unless Postal can be adequately identified with UBU. The trial court thus sustained objections to some offers of proof of UBU's wrongdoing pending proof of a sufficient legal link between Postal and UBU.

Evidentiary rulings such as these lie within the sound discretion of the trial court. *E. C. I. Corp. v. G. G. C. Co.*, 306 Minn. 433, 237 N.W.2d 627 (1976); *Smith v. Kahler Corp., Inc.*, 297 Minn. 272, 211 N.W.2d 146 (1973). And although, as plaintiffs point out, evidence of UBU's wrongdoing is relevant to the case in its broad outline, Rule 104(b) of the Minnesota Rules of Evidence provides:

> When the relevancy of evidence depends on the fulfillment of a condition of fact, the court shall admit it upon, or in the court's discretion subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

The Committee Comment to Rule 104(b) adds: "If the relevance of the offer is dependent on the existence of a second fact the court's function is to determine whether there is sufficient evidence admitted for a jury decision as to the existence of the second fact." The court's refusal to admit certain alleged wrongdoing by UBU until plaintiffs had first introduced evidence from which a jury could find a sufficiently close nexus between Postal and UBU was not an abuse of its discretion.

■ Plaintiffs also object to the trial court's exclusion of certain evidence on the ground that it was hearsay. These rulings also lie within the discretion of the trial

court. Again, some of the testimony was later admitted. Plaintiffs contend that certain statements were not offered for their truth but to show Postal's knowledge of these facts. Implicit in this, however, is the assumption that these facts are true; if not, Postal's knowledge of them would be irrelevant.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.