Victor V. VITOLS, et al.,
Plaintiffs–Appellants,

v.

The CITIZENS BANKING COMPANY,
Defendant–Appellee,

Tucker Anthony Incorporated,
et al., Defendants.

No. 92–3790.

United States Court of Appeals,
Sixth Circuit.

Argued June 14, 1993.

Decided Nov. 29, 1993.

Randolph L. Snow (argued), Terrence L. Seeberger (briefed), Black, McCuskey, Souers & Arbaugh, Canton, OH, for plaintiffs-appellants.

Sam O. Simmerman, David L. Simiele (argued and briefed), Krugliak, Wilkins & Griffiths, Canton, OH, for defendant-appellee.

Before: NELSON and SUHRHEINRICH, Circuit Judges; and MILES, Senior District Judge.*

---

* The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation.

DAVID A. NELSON, Circuit Judge.

This is a securities fraud case brought by investors in a now-defunct real estate partnership. The partnership accepted negotiable promissory notes from the plaintiffs in partial payment for limited partnership interests, and the notes were ultimately transferred to the defendant bank.

The bank sought and obtained a summary judgment declaring that it had become a holder of the notes for value, in good faith, without notice of any defenses, and was thus a holder in due course. As a holder in due course, the district court held, the bank took the notes free of whatever defenses the plaintiffs would otherwise have had against the holder.

The plaintiffs contend on appeal that summary judgment ought not to have been granted in this case because there are genuine issues of material fact with respect to the following questions: (1) whether the bank had "dealt" with the plaintiffs, thereby subjecting itself to the plaintiffs' defenses by reason of a proviso in § 3–305(2) of the Uniform Commercial Code that limits the benefits of holder in due course status to a holder who has not "dealt" with the party asserting the defense; (2) whether there was a sufficiently close connection between the bank and the partnership to deprive the bank of the rights of a holder in due course under the "close-connectedness" doctrine; and (3) whether the endorsements by which the bank took the notes conveyed less than the entirety of the instruments, thereby depriving the bank of holder in due course status under U.C.C. 3–202.

Concluding, on *de novo* review, that the relevant facts are not in dispute and that the bank is entitled to judgment as a matter of law, we shall affirm the judgment entered by the district court.

**I**

Defendant Citizens Banking Company is a federally chartered bank based in Ohio. In 1984, after participating with another financial institution in the purchase of promissory notes executed by investors in limited partnerships, the bank consulted a large New York securities firm about expanding this line of business. That firm referred the bank to Intercontinental Monetary Corporation ("IMC"), a successful dealer in "investor notes," as they are known in the trade.

The bank soon began taking such notes from IMC and, somewhat later, from an IMC affiliate known as U.S. Note Corporation. The business proved lucrative, and the bank engaged in similar transactions with other brokers as well. All of the notes at issue in the case at bar, however, were brought to the bank by U.S. Note Corporation.

These particular notes were executed by purchasers of interests in a Michigan limited partnership known as Certified Historic Income Properties VI ("CHIP VI"). The general partners were Schneider Twenty–Four, Inc., a Michigan corporation, and Herbert M. Schneider, its president and sole stockholder.

Schneider organized CHIP VI in April of 1988 with a view to having the partnership purchase a YMCA building in Louisville, Kentucky, for conversion into an office condominium complex. Defendant Tucker Anthony, a securities dealer, was engaged to offer limited partnership interests to qualified investors. Each such investor was given the option of paying entirely in cash or executing a promissory note for a portion of the purchase price. U.S. Note planned to buy such notes and resell them, assuming the investors proved to be creditworthy. The record indicates that the investors who executed notes furnished personal financial statements and tax returns (to Tucker Anthony, we assume) before acquiring their limited partnership interests.

Citizens Banking ultimately acquired all of the CHIP VI investor notes. The note executed by the lead plaintiff, Victor V. Vitols, came into the bank's hands through a series of transactions that replicates the path taken by most of the others; we shall use the Vitols note to illustrate how the process worked.

On December 29, 1988, Mr. Vitols, a resident of Massachusetts, signed an instrument captioned "negotiable promissory note." He has never contended that the note was anything other than a negotiable instrument. It recited that for value received Mr. Vitols

promised to pay to the order of CHIP VI the principal sum of $21,250. The money was payable in three annual installments, beginning January 15, 1990, with 11% interest on the unpaid balance. As collateral for the note Mr. Vitols granted a security interest in his limited partnership investment.

On the same day he signed the note Mr. Vitols executed an "estoppel letter." In the letter Mr. Vitols agreed, among other things, that the note could be assigned.

On February 17, 1989, CHIP VI transferred Mr. Vitols' note, along with those of other investors, to U.S. Note Corporation. An indorsement on the back of the Vitols instrument, executed by Schneider on behalf of CHIP VI, said this: "Pay to the order of U.S. Note Corporation." There is evidence that U.S. Note planned to reassign the note, directly or indirectly, to Citizens Banking; "it wasn't for sure," Mr. Schneider subsequently testified, "[b]ut that was the plan."

U.S. Note Corporation took the Vitols note and those of other investors as collateral on a $402,800 loan to CHIP VI. Under date of February 17, 1989, CHIP VI signed a nonrecourse promissory note in that amount; the instrument (sometimes referred to as a "master note") stated that the payee, U.S. Note, would look for payment only to the collateral, and not to the assets of CHIP VI or any general partner thereof. The aggregate principal amount of the collateral in question

(*i.e.* the notes executed by Vitols and other individual investors) was $425,000.

The master note and the individual investor notes securing it were transferred by U.S. Note to IMC, which on May 26, 1989, transferred the notes to Fleet National Bank, a financial institution based in Providence, Rhode Island. The record shows that Fleet—which was a holder in due course, as far as we know—promptly transferred all of the notes in this package, plus additional investor notes, to defendant Citizens Banking Co.[1] Each of the last three transfers of the Vitols note was effected under a signed indorsement on the back of the note reading as follows: "Pay to the order of [the transferee] without recourse to us." (It is undisputed that Citizens Banking took delivery of all the notes with indorsements in this form.) The consideration paid by Citizens Banking to Fleet was $520,000. The aggregate principal amount of the individual investor notes transferred by Fleet appears to have been $552,500.

Although Citizens Banking paid the $520,000 to Fleet, the deposition testimony of Citizens Banking officer Frank Layman described the transaction as a "warehousing loan" to IMC. The record contains a $520,000 promissory note dated May 30, 1989, payable to the order of Citizens Banking, executed by IMC and personally guaranteed

---

1. Also assigned to Citizens was a guaranty said to have been issued to CHIP VI by John Hancock Freedom Securities Corporation, with U.S. Note, IMC, and Fleet each being named as a "Permitted Assignee." We have not been favored with a copy of the John Hancock guaranty, and it is not clear to us whether the guaranty ran to Citizens Banking as well. (Frank Layman, a Vice President of Citizens Banking, suggested at some points in his deposition testimony that it did; at other points he seemed to ignore the John Hancock guaranty entirely.)

A separate instrument of assignment executed by Fleet on May 26 purported to assign to Citizens Banking "[c]ertain other documents, opinions, certificates, etc.," but we do not know what these documents were. Three packages of CHIP VI investor notes, but not the package in which Vitols' note was included, were assigned to Citizens Banking directly by U.S. Note; where this route was followed, the instrument of assignment purported to convey, among other things, a "servicing agreement." The servicing agreements

mentioned in two of the three direct assignment instruments were said to be agreements between CHIP VI and U.S. Note. The third such assignment instrument referred to a servicing agreement entered into by CHIP VI, U.S. Note, and Citizens Banking. Under the latter servicing agreement, it was agreed that CHIP VI would direct the makers of the relevant individual investor notes to send their payments on the notes to Citizens Banking; that Citizens would deposit the money in a "Payment Account" pledged by CHIP VI to U.S. Note and Citizens Banking as security for a $28,000 loan; and that CHIP VI would pay Citizens Banking $12.50 for each individual payment as compensation for its services as a collection agent. The deposition testimony of Frank Layman, the Citizens Banking Vice President, indicates that Citizens collected the payments on *all* investor notes, keeping CHIP VI advised as to who had paid and who had not. When an investor missed a payment, CHIP VI would send him a dunning letter.

by IMC's president and another IMC principal.

Mr. Layman's testimony indicates that Citizens Banking had not received full documentation on all of the individual investor transactions at this point. The warehousing loan to IMC would have been extinguished, Mr. Layman said, once Citizens Banking received documentation satisfactory to it with respect to all individual investors. From that point on, Layman indicated, Citizens Banking would be looking solely to the individual investors for payment.

Citizens Banking made it a practice to review each individual investor's file before deciding whether the investor's note was acceptable as collateral. From the bank's perspective, the testimony indicates, "these transactions [took] on some of the shape of loans to individuals." Mr. Layman went so far as to say, indeed, that he considered Citizens Banking to have made loans directly to the investors. The bank's president and chief executive officer, Marty Adams, likewise testified that the bank thought of itself as lending funds to or on behalf of the individual investors. And an affidavit executed by Mr. Layman says that Citizens Banking applied the same credit standards as if the investor had appeared in person and requested a loan.

The bank made no attempt to investigate the economic viability of the real estate project being developed by the CHIP VI partnership; it was the creditworthiness of the individuals themselves in which the bank was interested. (Citizens Banking did, however, rely on U.S. Note to screen general partners and weed out any who might be dishonest.) A section of a Citizens Banking policy manual devoted to investor note financing says this:

"The credit strength of each limited partner is the only basis for us making ... a loan. Therefore complete credit investigation and underwriting must be completed on each investor."

If the bank concluded that an individual investor's credit was not acceptable, the bank could and would refuse to "finance" that investor's note.

The total face amount of the investor notes included in any particular package of notes assigned to Citizens Banking always exceeded the amount of the master note for which they served as collateral. Mr. Layman's testimony indicates that it was Citizens Banking's policy to advance no more than 90 percent of the amount that the individual investors were committed to pay; the $520,-000 advanced by Citizens Banking on the package that included the Vitols note, however, was approximately 94 percent of what we understand to have been the total amount of the individual investor notes included in the package. Be that as it may, the record is clear that once the principal payments received by Citizens Banking on the individual notes in a given package reached the total amount of money due in a given time period, any additional receipts with respect to that period were sent on to the partnership.

Mr. Vitols and the other plaintiffs made the payments due early in 1990. It appears that their total payments exceeded the amount which Citizens Banking was entitled to keep, and that the overage was remitted to CHIP VI. In the latter part of 1990, however, the general partners of CHIP VI (Herbert Schnieder and his corporation) went bankrupt. Their investments having gone down the tube with Schnieder, Mr. Vitols and most of the other plaintiffs chose not to make the payments due early in 1991.

In March of 1991, with their notes in default (except for that of plaintiff R. Michael Rouleau, who made his scheduled payment of $16,780 on January 15, 1991), and with collection actions being threatened by Citizens Banking, the plaintiffs filed suit in the United States District Court for the Northern District of Ohio. The gist of the claim against Citizens Banking was that CHIP VI, Schnieder and Tucker Anthony had violated the federal securities laws in selling partnership interests to the plaintiffs; that the plaintiffs also had a variety of common law claims against these defendants; that Citizens Banking took the investor notes with notice that the plaintiffs had personal defenses on the notes; that Citizens Banking was not entitled to the benefits normally associated with holder in due course status; and that

the plaintiffs were therefore entitled to the return of what they had already paid on the notes, plus a declaration that Citizens Banking could not collect the balance.

Citizens Banking moved in due course for summary judgment in its favor. The plaintiffs filed a timely opposition, and discovery continued while the motion was pending. On February 21, 1992, the district court (Krenzler, J.) filed an opinion and order granting Citizens Banking's summary judgment motion. On July 7, 1992, the district court entered an amended order finding no just reason for delay and making the judgment final under Rule 54(b), Fed.R.Civ.P. The plaintiffs promptly appealed.

## II

Although the investor notes contain language stating that they are to be construed in accordance with Michigan law, the notes were transferred to Citizens Banking in the State of Ohio. The parties were uncertain, under these circumstances, whether the rights of Citizens Banking were governed by the law of Michigan or the law of Ohio. Both states have adopted the Uniform Commercial Code, however, and the parties told the district court that the law of both states was the same with respect to the matters at issue in the case. No choice of law question has been raised on appeal, and for purposes of this opinion we shall assume that either Ohio or Michigan law controls and that the result would be the same under the law of either state.

It is undisputed that each investor note was transferred to Citizens Banking for value under a proper indorsement. (Under U.C.C. 3–303(a) a holder takes a negotiable instrument "for value" to the extent that he acquires a security interest in the instrument.) If the indorsement was effective for negotiation—an issue we shall address in Section C of this part—Citizens Banking became a "holder." See U.C.C. 3–202(1): "Negotiation is the transfer of an instrument in such form that the transferee becomes a holder."

A holder who takes a negotiable instrument "(a) for value; and (b) in good faith;

and (c) without notice ... of any defense ..." is a "holder in due course." U.C.C. 3–302(1). The plaintiffs alleged in their complaint, "on information and belief," that Citizens Banking took assignment of their notes with notice of one or more potential defenses. This allegation was refuted by the affidavit of Citizens Bank Vice President Frank Layman, however, and the plaintiffs have not been able to point to any evidence to support the original allegation. For purposes of the summary judgment proceeding, therefore, Citizens Banking must be deemed to have taken the notes without notice. Whether there is a genuine issue as to Citizens' "good faith" will be discussed in Section B of this part.

### A

To the extent that Citizens Banking was a holder in due course, and subject to exceptions not claimed to be relevant here, Citizens took the notes "free from ... all defenses of any party to the instrument[s] *with whom the holder has not dealt....*" (U.C.C. 3–305(2)) (emphasis supplied). In their first assignment of error the plaintiffs assert that there is a genuine issue as to whether Citizens Banking had "dealt" with them prior to accepting assignments of their notes. Only if Citizens Banking had not "dealt" with the plaintiffs would it have taken the notes free from the alleged defenses.

Citizens Banking could be found to have "dealt" with the plaintiffs, according to the plaintiffs' brief, because the record is "replete with evidence that Citizens Banking viewed these transactions ... as the making of loans directly to the individual limited partners to permit them to invest in CHIP VI." In this connection the plaintiffs quote the following passage from the affidavit of Frank Layman:

> *"The Loans secured by each individual investor note were treated as separate loans made individually to the investor executing the note.* Citizens Banking applied the same credit standards to the Loans that would be applied if that investor had personally appeared at Citizens Banking and requested a personal loan." (Emphasis by the plaintiffs.)

The district court did not find the plaintiffs' argument persuasive. Neither do we.

It is true that Citizens Banking had no recourse against the general partners of CHIP VI or against the transferees of the CHIP VI master notes; unless the John Hancock guaranty ran to it, Citizens Banking had to look for payment solely to the makers of the individual notes. It is also true that the credit of the individual investors was evaluated under the same credit standards that would have been used if the investors had applied to Citizens Banking for loans rather than obtaining credit from CHIP VI. From Citizens' perspective, the credit risks it assumed in its dealings with Fleet and/or U.S. Note were identical to the credit risks it would have assumed had it made a series of individual loans to the individual investors— and, not surprisingly, Citizens conducted itself accordingly in evaluating the prospects of being able to get its money back. But the fact that in the course of its dealings with Fleet and U.S. Note Citizens Banking ran the same sort of credit checks that it would have run had it been dealing with the individual investors does not mean that Citizens *was* in fact dealing with the individual investors. And the plaintiffs have pointed to no evidence at all that it ·was they with whom Citizens Banking actually dealt.

The case of *Bank One of Columbus, N.A. v. Myers,* 14 Ohio App.3d 196, 470 N.E.2d 485 (Franklin Co.1984), illustrates the kind of dealings that can prevent a noteholder from taking the note free from the maker's personal defenses. Louella Myers, the defendant in that case, obtained a mortgage loan from the plaintiff bank and used the proceeds to buy a mobile home. Ms. Myers defaulted on her mortgage note, whereupon the bank sold the home and sought a deficiency judgment. As a defense to the bank's suit, Ms. Myers asserted breaches of warranty on the part of the manufacturer and the seller. (The home was defective and unsafe, Ms. Myers said.) The Ohio Court of Appeals held that the bank did not take its mortgage note free of these defenses, under the Ohio version of U.C.C. 3–305, because the bank had "dealt" with Ms. Myers when it made the loan to her.

The plaintiffs in the case at bar contend that their situation is comparable to that of Ms. Myers; just as Bank One held a security interest in Ms. Myers' mobile home, they point out, Citizens Banking held security interests in their limited partnership investments. But Citizens Banking did not acquire any such security interests until the notes were transferred to it weeks or months after the plaintiffs had made their investments. It was not the security interest that made Bank One subject to Ms. Myers' defenses, it was the fact that the bank had "dealt" with Ms. Myers when she procured her loan from it. None of the plaintiffs in the case at bar procured a loan from Citizens Banking, and Citizens simply never dealt with any of the plaintiffs until after the notes had been transferred.

### B

In their second assignment of error the plaintiffs assert that there is a genuine issue of fact—based on the "close-connectedness" doctrine—as to whether Citizens Banking acted in good faith when it accepted assignment of the plaintiffs' notes. Again we are not persuaded.

The close-connectedness doctrine, as adopted by the Supreme Court of Ohio in the third paragraph of its syllabus in *Arcanum National Bank v. Hessler,* 69 Ohio St.2d 549, 433 N.E.2d 204 (1982), teaches that:

> "A transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transactions from which the instrument originated."

*Cf. Cessna Finance Corp. v. Warmus,* 159 Mich.App. 706, 407 N.W.2d 66 (1987), where, without adopting the close-connectedness doctrine, the court held that factual issues as to good faith and notice were presented by a record showing that Cessna Finance Corporation, the assignee of a promissory note given by the purchaser of an airplane from Cessna Aircraft Company, had been named

as assignee in a pre-printed sales contract; that Cessna Finance had drafted the contract form and a promissory note form; that Cessna Finance had made an independent check of the purchaser's credit; and that the managements of Cessna Finance and Cessna Aircraft were related by common officers and common board members. See also *Unico v. Owen,* 50 N.J. 101, 109–110, 232 A.2d 405, 410 (1967), where the Supreme Court of New Jersey observed that "the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value...."

Five factors are commonly said to be taken into account in determining whether the transferee of a negotiable instrument is so closely connected to the original payee and the underlying transaction that the transferee cannot be found to have taken the instrument in good faith:

"(1) Drafting by the transferee of forms for the transferor; (2) approval or establishment or both of the transferor's procedures by the transferee (*e.g.,* setting the interest rate, approval of a referral sales plan); (3) an independent check by the transferee on the credit of the debtor or some other direct contact between the transferee and the debtor; (4) heavy reliance by the transferor upon the transferee (*e.g.,* transfer by the transferor of all or substantial part of his paper to the transferee) and; (5) common or connected ownership or management of the transferor and transferee." *Hessler,* 69 Ohio St.2d at 555, 433 N.E.2d at 210.

As to the notes executed by Mr. Vitols and most of the other plaintiffs in the case at bar, it may well be that the short answer to the close-connectedness question is this: the plaintiffs have pointed to no evidence whatever of any unusually close relationship between CHIP VI and the entity from which Citizens Banking acquired the notes in question, Fleet National Bank. If Fleet was a holder in due course, so was any subsequent holder that had not been a holder before and had not been a party to any fraud or illegality. U.C.C. 3–201(1).

Even if all the notes had been transferred directly by U.S. Note to Citizens Banking, however, we do not believe that the evidence on which the plaintiffs rely could suffice to show that Citizens Banking took the notes in bad faith. None of the five factors cited by the Ohio Supreme Court in *Hessler* is of any material help to the plaintiffs here.

1. There is no evidence that Citizens Banking drafted any forms for CHIP VI. U.S. Note may have done so, but there is no evidence that U.S. Note was acting as the agent of Citizens Banking.

2. There is no evidence that Citizens Banking either established or approved the procedures by which CHIP VI sold partnership interests through Tucker Anthony or set interest rates for the investor notes. Citizens Banking may have had a hand in setting interest rates for the master notes, but the rates for the individual investor notes would already have been established by then. The deposition testimony of Citizens Banking's president shows without contradiction that Citizens had no input into the setting of interest rates on the individual investor notes. The plaintiffs stress the existence of one or more servicing agreements under which Citizens collected payments on the notes and remitted any overage to CHIP VI, but there is no reason to suppose that Citizens Banking was a party to any such agreement when the plaintiffs decided to become investors and signed their notes.

3. Although Citizens Banking checked the credit of the individual investors, there is no evidence that it did so before the investors had committed themselves. The Layman affidavit says that the plaintiffs supplied personal financial statements and tax returns prior to purchasing their limited partnership interests in CHIP VI, but it was Tucker Anthony with whom the plaintiffs were dealing at that point, not Citizens Banking. Mr. Layman's unrefuted deposition testimony makes it very clear that it was not until January or February of 1989—after Mr. Vitols and most, if not all, of the other plaintiffs had already signed their notes—that Citizens Banking first heard about CHIP VI. And it was only when Citizens Banking received individual investor files on people who had

actually executed promissory notes that Citizens started its credit checks.

4. There is no real evidence that CHIP VI relied on Citizens Banking to take its paper. CHIP VI was relying, rather, on U.S. Note, an independent broker which did not approach Citizens Banking about this particular partnership, as we have seen, until most or all of the plaintiffs had already committed themselves to it. From the time of the first assignment of paper by CHIP VI to U.S. Note it was planned that Citizens Banking would be the ultimate assignee, according to Schneider, but this "wasn't for sure" and it hardly bespeaks the kind of relationship between CHIP VI and Citizens Banking that existed between Cessna Aircraft and Cessna Finance in the Michigan case cited above. In the Michigan case, it is clear, Cessna Finance was very much in the picture when the borrower committed himself to the purchase of the airplane; it is equally clear that Citizens Banking had never even heard of CHIP VI when Mr. Vitols decided to make his investment.

5. There is no evidence of any common or connected ownership of CHIP VI and Citizens Banking, just as there is no evidence of any common or connected management. Citizens Banking knew little or nothing about Schneider's plan for buying and rehabilitating the Louisville YMCA building through the CHIP VI partnership—the "underlying transaction" here—and the plaintiffs cannot point to any evidence that Citizens' good faith might be subject to question because of an unusually close relationship with CHIP VI. Citizens had no such relationship with CHIP VI, and the close-connectedness doctrine does not help the plaintiffs here.

### C

In their third and last assignment of error the plaintiffs argue that as a matter of law Citizens Banking was not a holder in due course because CHIP VI retained an interest in the proceeds of the investor notes. This argument fails because the indorsements on the investor notes were unqualified; each indorsement conveyed the entire instrument to which it related.

One cannot become a "holder" of a negotiable instrument without the instrument's having been "negotiated" to him. If the instrument is payable to the order of a designated party, as the plaintiffs' notes were, "it is negotiated by delivery with any necessary indorsement"—and "[a]n indorsement is effective for negotiation only when it conveys the entire instrument or any unpaid residue." U.C.C. 3–202(1) and (3).

Each of the indorsements at issue here conveyed the entire instrument. Under the plain language of the statute, therefore, each indorsement ·was effective for negotiation.

It does not matter that the instruments were conveyed only for collateral, or that the obligations secured thereby were for less than the face amounts of the instruments. What matters is that each of the indorsements purported to convey the entire instrument without qualification. See *All American Finance Co. v. Pugh Shows, Inc.*, 30 Ohio St.3d 130, 507 N.E.2d 1134 (1987), where a partial interest in the note in question was conveyed as collateral, without indorsement, by a separate instrument of assignment. In holding that the note had not been "negotiated," the Ohio Supreme Court observed that the transferee "could have required the unqualified indorsement of [the transferor] on the note. [The transferee] could then have executed a separate instrument establishing its security interest without losing its status as a holder in due course even though the indebtedness to [the transferee] was less than the full amount of the note." 30 Ohio St.3d at 134 n. 7, 507 N.E.2d at 1138 n. 7. In the case at bar there were proper indorsements on the investor notes themselves, Citizens' security interest was established in separate instruments, and Citizens did not lose its status as a holder in due course even though it was owed less than the full amount of the investor notes.

Our resolution of these issues makes it unnecessary for us to address Citizens Banking's remaining arguments. The judgment in favor of Citizens is **AFFIRMED.**