2013 COA 81

**DEUTSCHE BANK TRUST COMPANY AMERICAS, f/k/a Banker's Trust Company, as trustee and custodian by Saxon Mortgage Services, Inc., f/k/a Meritech Mortgage Services, Inc., as its attorney-in-fact; and Saxon Mortgage, Inc., Appellees,**

v.

**Veronica E. SAMORA, Appellant.**

**Court of Appeals No. 12CA0872**

Colorado Court of Appeals,
Div. I.

Announced May 23, 2013

Rehearing Denied July 3, 2013

City and County of Denver District Court No. 07CV6539, Honorable Edward D. Bronfin, Judge, Honorable Brian Whitney, Judge

Arnowitz & Mecklenburg, LLP, Randall M. Chin, Lissa E. Kalt, Lauren E. Tew, Denver, Colorado, for Appellee Deutsche Bank

Greenberg Traurig, LLP, Jeffrey M. Lippa, Cuneyt A. Akay, Denver, Colorado, for Appellee Saxon Mortgage, Inc.

Wade Ash Woods Hill & Farley, P.C., Steven R. Schumacher, Denver, Colorado, for Appellant

Opinion by JUDGE GRAHAM

¶ 1 Defendant, Veronica E. Samora, appeals the trial court's judgment in favor of Deutsche Bank Trust Company Americas (Deutsche Bank). Samora also appeals the trial court's dismissal of her claims against Saxon Mortgage, Inc. (Saxon Mortgage). We affirm and remand for an award of attorney fees.

## I. Background

¶ 2 On June 30, 1997, Samora purchased the real property at 4555 W. 33rd Avenue, Denver, Colorado 80212 (the Property). She financed the purchase with a note and deed of trust.

¶ 3 In 2003, Samora fell behind on the payments on the note, and foreclosure proceedings were initiated. It is disputed whether Samora was aware of the foreclosure action.

¶ 4 However, in October 2003, Samora approached Randy Gonzales to refinance the Property in order to lower her monthly mortgage payments. Gonzales was a mortgage broker for Denver Metro Mortgage, Inc., a business owned by Kenneth Medina, Gonzales's uncle. In October, with the assistance of Gonzales, Samora executed a new promissory note and deed of trust in favor of BNC Mortgage, Inc. Soon thereafter, BNC Mortgage, Inc. transferred Samora's note and deed of trust to Chase Bank.

¶ 5 On October 21, 2003, by forging Samora's signature on a quitclaim deed, Gonzales and Medina transferred title to the Property into their names. Thereafter, Medina obtained a loan for $32,000 from a third party which he secured by yet another note and deed of trust. Medina later executed a second quitclaim deed in favor of Gonzales, supposedly transferring title to the Property solely to Gonzales.

¶ 6 Samora was unaware of these transactions by Medina and Gonzales in 2003. However, in May 2004, Samora sought a second refinancing of the Property in order to obtain a lower interest rate. When she inquired with Chase Bank about refinancing, she was told the Property belonged to Gonzales.

¶ 7 Samora confronted Gonzales, who acted "surprised" to learn that title to the Property was in his name. According to Samora, he assured her that the mistake would be fixed and title would be returned to her name. On September 9, 2004, Gonzales signed and filed a quitclaim deed transferring title to the Property back to Samora.

¶ 8 Despite losing title to the Property while working with Gonzales, Samora agreed to use Medina for her second refinance.

Medina, learning that Samora was ineligible for refinancing, decided to sell the Property to his girlfriend, Amanda Wasia, who would then lease the Property back to Samora. Samora was, again, unaware of this plan.

¶ 9 In September 2004, Gonzales completed a loan application for Wasia with Saxon Mortgage. The loan application falsely stated that Wasia's income was $4,000 a month and that Wasia would be using the Property as her primary residence. Despite these false statements, Wasia did not qualify for a loan. Matthew Libby, a loan officer with Saxon Mortgage, suggested to Medina and Gonzales that they submit a falsified gift letter stating that Wasia was Samora's granddaughter and that Samora was gifting the equity in her home to Wasia. Based upon the falsified gift letter and loan application, Saxon Mortgage approved a loan in favor of Wasia for $172,000.

¶ 10 On September 20, 2004, Medina told Samora that her refinancing had been approved, and he insisted she come to his office to sign the refinancing documents that day. When Samora arrived, Medina placed a document in front of her, covering the top portion with his hand, and encouraged her to sign. Samora noticed the document was titled "Warranty Deed" and that Wasia, an individual she had never met, was on the deed. When she questioned Medina about this, he falsely stated that Wasia was a co-signer and assured her that Wasia was on the deed for Samora's protection. Samora signed the warranty deed conveying the Property to Wasia. The warranty deed was recorded on October 4, 2004.

¶ 11 Also on September 20, 2004, Wasia executed a note and deed of trust in favor of Saxon Mortgage for the $172,000 loan (Note and Deed of Trust). The proceeds of the loan were used in part to pay off Samora's existing loan on the Property. Saxon Mortgage endorsed the Note in blank and the Note and Deed of Trust were later deposited in the trust res of Saxon Asset Securities Trust 2004–3 (Trust). Deutsche Bank is the indentured trustee of the Trust.

¶ 12 In 2005, the scheme unraveled. After Medina withdrew unauthorized amounts

from a bank account he shared with Wasia, Wasia told Samora to begin sending her "rent checks" to Wasia—the owner of the home. Samora then contacted the Denver District Attorney's Office and after investigation, Gonzales, Wasia, Medina, and Libby were all indicted by a grand jury for various crimes, including fraud. Each party pled guilty, and, as part of their plea agreements, each executed a quitclaim deed in favor of Samora, transferring whatever interest they had in the Property back to Samora.

¶ 13 While the criminal proceedings were ongoing, no payments were made on the Note. In October 2006, Deutsche Bank, as trustee for the Trust, filed a C.R.C.P. 120 proceeding in Denver District Court seeking to foreclose on the Property. Based upon the fraudulent actions of Medina, Gonzales, Wasia, and Libby, and the complexity of the underlying transactions, the magistrate denied Deutsche Bank's requested foreclosure.

¶ 14 In July 2007, Deutsche Bank filed the current C.R.C.P. 105 action to quiet title in the Trust. A default judgment was entered, which Samora appealed and a division of this court reversed. *Deutsche Bank Trust Co. v. Samora,* 2009 WL 1816263 (Colo.App. No. 08CA1877, June 25, 2009) (not published pursuant to C.A.R. 35(f)) (*Samora I*).

¶ 15 After the division in *Samora I* reversed, Deutsche Bank amended its complaint to include a claim for unjust enrichment. Samora filed her amended answer on November 2, 2009, alleging, for the first time, "counterclaims" against Deutsche Bank as trustee for the Trust and "cross-claims" against Saxon Mortgage.

¶ 16 Saxon Mortgage filed a motion to dismiss based upon the two-year statute of limitations applicable to each of Samora's cross-claims. On February 17, 2010, the trial court granted Saxon Mortgage's motion to dismiss, concluding that "the cross[-]claims [accrued] in December 2005" but "[n]o claims were made against any party prior to December 2007" and that Samora "must have been aware of the potential for an actionable claim against some party upon issuance of the criminal indictments. Failure to act upon those claims in the two[-]year statute of limitations is not excused by some other party not attempting to foreclose until later."

¶ 17 A trial to the court was held on Deutsche Bank's and Samora's claims and counterclaims. In a written order, the court found in favor of Deutsche Bank and against Samora. The court concluded that valid title had passed from Samora to Wasia when Samora executed the warranty deed, and that the deed was not void for fraud in the factum. Based upon this conclusion, the court further held that Deutsche Bank was a holder in due course of the Note and Deed of Trust, and, therefore, was entitled to foreclose on the Property. Deutsche Bank also received judgment in its favor for $5,994.79 in property taxes and insurance it had paid on behalf of Samora.

## II. Claims Against Saxon Mortgage

¶ 18 On appeal, Samora contends the trial court erred in granting Saxon Mortgage's motion to dismiss based on the statute of limitations. We disagree.

¶ 19 We review de novo an order granting a motion to dismiss for failure to state a claim under C.R.C.P. 12(b)(5). *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010). During our review, we accept all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Id.* The trial court properly grants a C.R.C.P. 12(b)(5) motion only where the plaintiff's factual allegations cannot, as a matter of law, support a claim for relief. *Id.*

### A. Statute of Limitations

¶ 20 "Whether a statute of limitations bars a particular claim is a question of fact." *Trigg v. State Farm Mut. Auto. Ins. Co.,* 129 P.3d 1099, 1101 (Colo.App.2005). "However, if undisputed facts demonstrate that the plaintiff had the requisite information as of a particular date, then the issue of whether the statute of limitations bars a particular claim may be decided as a matter of law." *Id.*

¶ 21 Samora filed cross-claims against Saxon Mortgage on November 2, 2009, alleging outrageous conduct and civil conspiracy, and requesting a determination that the Deed of Trust was a spurious document. Under sec-

tion 13–80–102(1)(a), C.R.S.2012, tort actions must be brought within two years after the cause of action accrues. Spurious document and lien claims must also be brought within two years of accrual. § 13–80–102(1)(i), C.R.S.2012.

¶ 22 "[A] cause of action for injury to person, property, reputation, possession, relationship, or status shall be considered to accrue on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence." § 13–80–108(1), C.R.S.2012; *see Murry v. GuideOne Specialty Mut. Ins. Co.,* 194 P.3d 489, 492 (Colo.App.2008).

### 1. Accrual of the Cause of Action

¶ 23 Samora contends that the injury giving rise to her cross-claims against Saxon Mortgage did not occur until Deutsche Bank began its foreclosure proceedings in October 2006.[1] Accordingly, Samora contends her cross-claims against Saxon Mortgage did not accrue until October 2006. We disagree.

¶ 24 "The point of accrual requires knowledge of the facts essential to the cause of action, not knowledge of the legal theory supporting the cause of action." *Murry,* 194 P.3d at 492; *see Winkler v. Rocky Mountain Conference,* 923 P.2d 152, 159 (Colo.App. 1995). In order to defeat Saxon Mortgage's motion to dismiss, Samora must show that her factual allegations, as a matter of law, support a claim for relief. *Bly,* 241 P.3d at 533.

¶ 25 Here, Samora's amended answer contained the following factual allegations:

- Samora admitted that criminal indictments were brought as alleged in Deutsche Bank's second amended complaint, "although such were not brought until December 2005," and further stated "that each of these individuals, Medina, Libby, Gonzales, and Wasia, pled guilty to various charges as a result of the criminal indictments."

- "When Samora learned that Wasia was claiming ownership of the Property, Samora contacted the Denver District Attorney's office, and indictments were filed against Medina, Gonzales, Wasia, and Libby for their respective roles in the fraud perpetrated on Samora. Each of these individuals pled guilty to criminal charges relating to their respective roles in the fraudulent scheme designed to deprive Samora of ownership of the Property."

- "Samora did not learn of Libby's involvement as an employee and/or agent of Saxon Mortgage, Inc., until after a criminal indictment was brought against Libby in December ... 2005."

¶ 26 First, we reject Samora's argument that "the injury being claimed ... arose when she learned of Deutsche[ ] [Bank's] attempts to foreclose on the [N]ote and Deed of Trust signed by Wasia." Samora's argument conflates the result of her injury and the actual injury itself. Deutsche Bank was only able to initiate foreclosure proceedings against Wasia because Samora had executed the warranty deed. Thus, Samora was injured when she executed that deed and transferred title to the Property on September 20, 2004, making it possible for Wasia to execute the Note and Deed of Trust.

¶ 27 Second, based upon the factual allegations asserted on the face of her cross-claims, we conclude that Samora's cause of action against Saxon Mortgage accrued in December 2005. At that time, Samora had been injured and the cause of the injury "should have been known by the exercise of reasonable diligence." § 13–80–108(1). Prior to December 2005, Samora approached the Denver District Attorney's Office regarding the fraud. In December 2005, indictments were issued against Medina, Gonzales, Libby, and Wasia based upon their scheme to transfer title to the Property. Although Samora contends on appeal that her cross-claims state she did not know of the indictments until "after" December 2005, based upon her con-

---

1. Samora argues that "genuine issues of material fact" exist to preclude a finding that the statute of limitations applies. We note this is the standard to defeat a motion for summary judgment, *see* C.R.C.P. 56(c) ("no genuine issue as to any material fact"), not a motion to dismiss for failure to state a claim, *see* C.R.C.P. 12(b)(5); *Bly,* 241 P.3d at 533 ("plaintiff's factual allegations cannot, as a matter of law, support·a claim for relief").

tact with the district attorney's office and her active pursuit of criminal actions against Medina, Gonzales, Wasia, and Libby, we reject her contention that her factual allegation of an unknown date "after" December 2005 defeats Saxon Mortgage's motion to dismiss. Rather, we conclude that either she knew of the indictments in December 2005, or, based upon her participation in bringing the criminal charges, Samora should have known of the indictments in December 2005. Further, we conclude that had she exercised "reasonable diligence" she would have discovered that she no longer held title in the Property and that Wasia's Note and Deed of Trust now encumbered the Property. Because Samora is attempting to hold Saxon Mortgage liable for the tortious acts of Libby, her causes of action against Saxon Mortgage also accrued in December 2005.

¶ 28 Samora's reliance on *Doyle v. Linn,* 37 Colo.App. 214, 547 P.2d 257 (1975), is misplaced. In *Doyle,* a division of this court concluded that the statute of limitations applicable to the plaintiffs' claim for negligence against a boundary surveyor did not begin to run until final determination of their litigation with the federal government over the property's boundary line. *Id.* at 216, 547 P.2d at 259. The division held that "[t]he mere assertion of a claim of adverse title does not in and of itself constitute damage" and that "[b]efore the statute of limitations begins to run there '(must) be some damage which would entitle plaintiff to maintain a cause of action.'" *Id.* (quoting *Housing Auth. v. Leo A. Daly Co.,* 35 Colo.App. 244, 247, 533 P.2d 937, 938 (1975)).

¶ 29 Here, the facts clearly establish that Samora was damaged by Gonzales's, Medina's, Wasia's, and Libby's actions on September 20, 2004, when she transferred title to the Property, divesting her of ownership, based upon Medina's misrepresentations and Wasia's execution of the Note and Deed of Trust with the help of Libby. Therefore, this case is distinguishable from *Doyle,* because unlike the plaintiffs in *Doyle,* Samora

suffered actionable damage on the date she transferred title.

¶ 30 Lastly, we reject Samora's position that by receiving quitclaim deeds from Wasia, Gonzales, Medina, and Libby as part of their plea agreements, she reasonably believed that her injury had been ameliorated and, therefore, the statute of limitations was no longer running. First, Samora provides no legal authority for this position. Second, this is not the standard for injury or accrual. Rather, Samora had already been injured and the cause of action accrued when she, in the exercise of reasonable diligence, knew or should have learned of the Note and Deed of Trust. As we have concluded above, that date was December 2005.

### 2. Mistaken Identity and the Relation Back Doctrine

¶ 31 Samora further argues that based upon mistaken identity between Deutsche Bank and Saxon Mortgage,[2] her cross-claims filed in November 2009 should relate back to her original answer filed on July 18, 2008. However, because we have concluded, as did the trial court, that Samora's claims accrued in December 2005, even if her November 2009 cross-claims related back to her July 2008 answer, her cross-claims are still time barred by the applicable statute of limitations. § 13–80–102(1)(a), (i).

### 3. Equitable Tolling

¶ 32 Samora contends that the doctrine of equitable tolling should prevent the application of the statute of limitations in this case. We reject this contention.

¶ 33 "[E]quitable tolling of a statute of limitations[ ] 'is limited to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts.'" *Cork v. Sentry Ins.,* 194 P.3d 422, 427 (Colo.App.2008) (quoting *Brodeur v. Am. Home Assurance Co.,* 169 P.3d 139, 149 (Colo.2007)). "When a

---

**2.** We are unaware if Deutsche Bank ever represented itself as Saxon Mortgage. Instead, it appears that Deutsche Bank represented itself as

"Saxon," holding the interest of the Saxon Asset Securities Trust 2004–3 and attorney-in-fact for Saxon Mortgage Services, Inc.

rigid application of the statute of limitations leads to an unjust result, courts may properly fashion an equitable exception to the limitations period...." *Shell W. E & P, Inc. v. Dolores Cnty. Bd. of Comm'rs,* 948 P.2d 1002, 1007 (Colo.1997).

■ ¶ 34 The facts of this case do not support the application of equitable tolling. First, Samora contends that Deutsche Bank's wrongful conduct in identifying itself as "Saxon" in pleadings prevented her from bringing the claim. However, Deutsche Bank, at all pertinent times, identified itself as trustee and sought to first foreclose the Property on behalf of the Trust and, here, to quiet title to the Property in the Trust.

¶ 35 Second, while Samora argues "extraordinary circumstances," she does not identify what circumstances make her case extraordinary. Samora knew or should have known in December 2005 that Libby, Saxon Mortgage's employee, helped perpetrate a fraud which resulted in her loss of the Property. Her failure to file anything until July 18, 2008 is not due to any extraordinary circumstances, and the application of the limitation statutes is not unjust. "Statutes of limitation are enacted to promote justice, discourage unnecessary delay, and forestall prosecution of stale claims." *Dean Witter Reynolds, Inc. v. Hartman,* 911 P.2d 1094, 1096 (Colo.1996). Applying the statutes of limitation to Samora's claims both discourages unnecessary delay and forestalls the prosecution of stale claims. We therefore conclude that equitable tolling does not apply to Samora's untimely claims.

#### B. Attorney Fees

¶ 36 Saxon Mortgage was awarded reasonable attorney fees by the trial court pursuant to section 13–17–201, C.R.S. 2012, and is entitled to reasonable attorney fees for defending this appeal. *See* C.A.R. 39.5; *Henderson v. Bear,* 968 P.2d 144, 148 (Colo. App.1998); *Levy–Wegrzyn v. Ediger,* 899 P.2d 230, 233 (Colo.App.1994) ("When, as here, a party, pursuant to a statute, has been appropriately awarded attorney fees for a stage of the proceeding prior to the appeal, that party will be entitled to reasonable attorney fees for defending the appeal.").

However, because the trial court is in a better position to determine the reasonable attorney fees incurred by Saxon Mortgage, we remand the case for further proceedings on that issue.

#### III. Claims Against Deutsche Bank

■■ ¶ 37 We review a judgment after a trial to the court as a mixed question of fact and law. *Lawry v. Palm,* 192 P.3d 550, 558 (Colo.App.2008). We must accept the trial court's findings of fact unless they are so clearly erroneous as to have no support in the record. *See* C.R.C.P. 52 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Schuler v. Oldervik,* 143 P.3d 1197, 1201 (Colo.App.2006). However, "when facts are presented to the trial court by stipulation, or uncontested documentary evidence ... an appellate court may draw its own conclusions." *M.D.C./ Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1382 (Colo.1994). We review de novo the court's application of the governing legal standards. *Lawry,* 192 P.3d at 558.

■ ¶ 38 An appellate court may affirm the trial court's ruling based on any grounds that are supported by the record. *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402, 406 (Colo.App.2004).

#### A. Fraud in the Factum

■ ¶ 39 Samora contends the trial court committed reversible error in concluding that she failed to establish fraud in the factum in the execution of the warranty deed. Specifically, she argues that the trial court used the objective standard of "a person of ordinary prudence and caution" rather than a subjective standard based upon her own intelligence, education, and experience in reaching the conclusion that she was not excusably ignorant in executing the warranty deed. For reasons different from those relied upon by the trial court, we conclude that Samora has not established fraud in the factum.

It is well established that a forged deed is void and conveys no title. *Upson v.*

**598**

*Goodland State Bank & Trust Co.,* 823 P.2d 704, 705 (Colo.1992). It is similarly clear that fraudulent acts generally render a deed voidable, but not void. *See Bray v. Trower,* 87 Colo. 240, 247, 286 P. 275, 278 (1930); *Sec. Servs., Ltd. v. Equity Mgmt., Inc.,* 851 P.2d 921, 924 (Colo.App.1993). If a deed is voidable for fraud, it will convey good title to a bona fide purchaser. *See Martinez v. Affordable Housing Network, Inc.,* 123 P.3d 1201, 1205 (Colo.2005); *Sec. Servs., Ltd. v. Equity Mgmt., Inc., supra,* 851 P.2d at 924.

If a person has been fraudulently deceived about the nature of a document, so that he or she is excusably ignorant about what has been signed, courts recognize "fraud in the factum." *See Meyers v. Johanningmeier,* 735 P.2d 206, 207 (Colo. App.1987) (explaining relationship between statutory defense against holders in due course of negotiable instruments and the common law defense of fraud in the factum). Unlike other types of fraud, fraud in the factum yields an instrument that is void, and not merely voidable. *Akins v. Vermast,* 150 Or.App. 236, 945 P.2d 640, 643 n.7, *adhered to on reconsideration,* 151 Or.App. 422, 950 P.2d 907 (1997); *Bennion Ins. Co. v. 1st OK Corp.,* 571 P.2d 1339, 1341–42 (Utah 1977).

*Svanidze v. Kirkendall,* 169 P.3d 262, 266 (Colo.App.2007). " '[T]he distinction between void and voidable deeds becomes highly important in its consequences to third persons, 'because nothing can be founded upon a deed that is absolutely void, whereas from those which are only voidable, fair titles may flow.' " *Delsas v. Centex Home Equity Co.,* 186 P.3d 141, 144 (Colo.App.2008) (quoting *Medlin v. Buford,* 115 N.C. 260, 20 S.E. 463, 463 (1894)).

If a grantor is aware that the instrument he is executing is a deed and that it will convey his title, but is induced to sign and deliver by fraudulent misrepresentations or undue influence, the deed is voidable and can be relied upon and enforced by a bona fide purchaser.

*Id.* (quoting *Fallon v. Triangle Mgmt. Servs., Inc.,* 169 Cal.App.3d 1103, 1106, 215 Cal. Rptr. 748, 749–50 (1985)); *cf. West v. Roberts,* 143 P.3d 1037, 1045 (Colo.2006) (in the context of the sale of goods, "theft by fraud that results in a voluntary transfer of the stolen property" is distinguishable from "theft by wrongful taking," and "[b]y relinquishing possession of the goods to the buyer, even when fraudulently induced to do so, the original seller cloaks the 'thief' with the apparent authority to sell the goods").

¶ 40 In its written order, the trial court concluded that "although ... Samora was fraudulently deceived about the nature of the *transaction,* she was not excusably ignorant about what she signed on September 20, 2004" (emphasis added). The trial court further held that Samora had not acted as "a person of ordinary prudence and caution" in executing the warranty deed. Accordingly, the court concluded that Samora did not establish fraud in the factum.

¶ 41 On appeal, Samora contends that the court committed reversible error in using an objective standard of "ordinary prudence" rather than a subjective standard based upon her education, age, and other considerations, to determine whether she was excusably ignorant in signing the warranty deed.

¶ 42 We agree with Samora that the proper standard to determine excusable ignorance is subjective based upon intelligence, education, and business experience. *Cf.* § 4–3–305 cmt. 1, C.R.S. 2012 ("The test of the defense [of fraud in the factum] is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the intelligence, education, business experience, and ability to read or understand English of the signer.").

¶ 43 However, we further conclude that Samora has failed to establish fraud in the factum both because she was not fraudulently deceived about the nature of the *document* she signed and because she had a reasonable opportunity to obtain knowledge, and, therefore, was not excusably ignorant.

¶ 44 Samora was not fraudulently deceived about the nature of the document she signed. Rather, she believed the fraudulent misrepresentations by Medina about the *use* of the warranty deed, while still understanding that the document she signed was, in fact, a warranty deed. Our conclusion differs from the trial court's in the respect that the trial court replaced the term "document" with the word "transaction" in its order, which is not the standard for fraud in the factum.

¶ 45 The stipulated facts and evidence introduced at trial showed that Medina fraudulently misrepresented to Samora that the warranty deed was to refinance her home and for "her protection." These statements were clearly fraudulent. However, Medina did not represent that the document Samora signed was anything other than a warranty deed. Accordingly, Samora was not fraudulently deceived about the nature of the document, but rather she was "induced to sign and deliver by fraudulent misrepresentation" the warranty deed—making the deed voidable but not void. *See Delsas*, 186 P.3d at 144; *Svanidze*, 169 P.3d at 266.

¶ 46 Furthermore, we agree with the trial court that Samora was not excusably ignorant. Here, the stipulated facts show that prior to the execution of the warranty deed on September 20, 2004, Samora learned that title to the Property had been placed in the name of Gonzales, Medina's coworker and nephew. While Samora testified that Gonzales acted "surprised" to learn that he was the record owner of the Property, we conclude that after Samora learned that her home had been titled in another's name, she did not have good reason to rely on the representations of Medina that the warranty deed would not be used to convey title to the Property. Furthermore, Samora chose to accept Medina's misrepresentations rather than to further investigate the transaction after discovering the document was a warranty deed with the name of an individual she had never met. Under these circumstances, it is clear that Samora was not ex-cusably ignorant. Thus, the warranty deed was voidable but not void.

## B. Close Relationship Doctrine

¶ 47 Because the warranty deed is not void, in order for Samora to defeat Deutsche Bank's claim to quiet title in the Trust, she must show that Deutsche Bank as trustee is not advancing a claim by the Trust as a holder in due course of the Note and Deed of Trust.[3]

> "[H]older in due course" means the holder of an instrument if:
>
> (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
>
> (2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice that any claim to the instrument described in section 4–3–306, and (vi) without notice that any party has a defense or claim in recoupment described in section 4–3–305(a).

§ 4–3–302(a), C.R.S. 2012; *see, e.g., Money Mart Check Cashing Center, Inc. v. Epicycle Corp.*, 667 P.2d 1372, 1373–74 (Colo.1983).

¶ 48 Samora argued to the trial court that the interrelated Saxon companies and the Trust represented by Deutsche Bank shared such a "close connectedness" that the Trust's status as a holder in due course should be defeated. The trial court did not address Samora's argument, but rather concluded Deutsche Bank was a holder in due course.

¶ 49 Initially, we agree with Samora that the proper focus of this inquiry is on the status of the Trust. Deutsche Bank, as trustee of the Trust, only enjoys that status which the Trust enjoys. *See* § 4–3–302(a);

**3.** Here, the trustee is acting for the Trust and advancing a claim on behalf of the Trust. Accordingly, the Trust must satisfy holder in due course status. The parties stipulated that the Trust took the Note and Deed of Trust without actual knowledge of any wrongdoing or fraud. The record indicates that the Trust gave value for the Note and Deed of Trust.

*cf. Investors' Fin. Co. v. Bodnar*, 87 Colo. 498, 504, 289 P. 599, 601 (1930) (a trustee in bankruptcy is not a bona fide purchaser for value but takes a note subject to all defenses the maker may have against the payee). While Deutsche Bank is the current holder of the Note, it did not give separate value for the Note, and, therefore, it may only enjoy the same status that the Trust has. *See* § 4-3-302(a)(2) (a holder in due course must give value for the instrument).

¶ 50 In certain circumstances, an assignee's status as a holder in due course may be defeated when the original payee of the instrument is so closely related to the assignee that, as a matter of law, the assignee is subject to all defenses against the original payee. *Gross v. Appelgren*, 171 Colo. 7, 18, 467 P.2d 789, 794 (1970) (" 'the more the holder knows about the underlying transaction, and ... participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving, credit-extending commercial world' ") (quoting *Unico v. Owen*, 50 N.J. 101, 232 A.2d 405, 410 (1967)).

If the signers on a note are able to prove close connectedness between the original payee of the note and an assignee thereof ... then such relationship effectively invalidates the assignee's claim to a holder in due course status and allows the defenses available against the payee also to be asserted against the assignee.

The underlying theoretical basis for this close-connectedness doctrine is that the assignee is in such a close relationship with the assignor that it is either involved with many aspects of the assignee's business, or has responsibility in this regard, and the two companies have established such a significant ongoing interconnected business relationship that the conduct of the assignor is imputable to the assignee.

*Stotler v. Geibank Indus. Bank*, 827 P.2d 608, 611 (Colo.App.1992) (citations omitted); *see Gross*, 171 Colo. at 17, 467 P.2d at 794 (a close relationship between a nominal payee and a bank invalidated holder in due course status); *Rehurek v. Chrysler Credit Corp.*, 262 So.2d 452, 454 (Fla.Dist.Ct.App.1972) (financier as assignee was too closely related to take as a holder in due course); *see also A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S.A.*, 41 F.3d 830, 841 (2d Cir.1994) (close connectedness doctrine did not apply when there was no common management or other connection between a financier and a payee even when financier participated in the arranging of finances for the underlying transaction that gave rise to the notes that it then purchased); *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F.Supp. 1304, 1318 (D.S.C.1994) (the close connection doctrine allows a maker of a note to establish a defense against a third party when that third party is closely connected to the payee, such as a sister company, subsidiary, or parent company), *aff'd*, 87 F.3d 1308 (4th Cir.1996) (unpublished table disposition); *see generally Commercial Credit Co. v. Childs*, 199 Ark. 1073, 137 S.W.2d 260, 262 (1940); *Commercial Credit Corp. v. Orange Cnty. Machine Works*, 34 Cal.2d 766, 214 P.2d 819, 822 (1950). The close relationship doctrine targets the good faith of a holder in due course. *See A.I. Trade Fin., Inc. v. Altos Hornos de Vizcaya, S.A.*, 840 F.Supp. 271, 276 (S.D.N.Y. 1993) (" 'a transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate [that] the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transactions from which the instrument originated' ") (quoting *Vitols v. Citizens Banking Co.*, 10 F.3d 1227, 1233 (6th Cir. 1993)), *aff'd*, 41 F.3d 830 (2d Cir.1994).

¶ 51 Here, the following facts were stipulated to at the trial:

- "Saxon Funding Management, Inc., Saxon Mortgage Services, Inc., and Saxon Mortgage, Inc. are consolidated fully owned subsidiaries of Saxon Capital, Inc."

- "The Trust took the Note without actual knowledge of any wrongdoing or fraud on the part of Saxon [Mortgage]."

¶ 52 Evidence at trial also established that Saxon Funding Management, Inc. sold the Note and Deed of Trust to Saxon Asset Securities Company as part of a larger $730 million transaction. Saxon Asset Securities Company then deposited the Note and Deed of Trust in the Trust.

¶ 53 However, Samora introduced no evidence at trial or by stipulation that Saxon Mortgage and the other Saxon entities shared employees, officers, directors, or other members, or that any one entity controlled the actions of another. Thus, for Samora to prevail, we would have to decide that corporate status is, in and of itself, enough to establish a close relationship causing the conduct of Saxon Mortgage to be imputable to the Trust.

██ ¶ 54 We conclude that corporate status alone is insufficient to prove a close relationship. Samora provided no authority, and our independent research found none, which concludes that related corporate entities are, as a matter of law, too closely connected to take an instrument as a holder in due course from one another. There must be some other indicia that the related corporations knew or should have known that the instrument was infirm. *See, e.g., Vitols,* 10 F.3d at 1233; *Arcanum Nat'l Bank v. Hessler,* 69 Ohio St.2d 549, 433 N.E.2d 204, 210 (1982) (applying a five-factor test to determine close relationship). Accordingly, we hold that the fact that an assignor and an assignee of a negotiable instrument are corporate siblings or have a corporate parent-subsidiary relationship is not enough to establish as a matter of law a close connection barring holder in due course status.

¶ 55 We reject Samora's argument that immediate assignment of the Note, the fact that the Note was transferred with thousands of other mortgages into the Trust, and the fact that Saxon Mortgage warranted that the Note met certain marketable standards establish a close relationship between Saxon Mortgage and the Trust. These are common business transactions, and no evidence was introduced to show that these transactions resulted from a close relationship or otherwise invalidated the Trust's good faith in taking the Note.

¶ 56 Thus, based upon the facts presented at trial and found by the trial court, we conclude that there was no error in determining that Deutsche Bank as trustee for the Trust and, by necessity the Trust, is a holder in due course. The record before us shows that the Trust took the Note and Deed of Trust for value and without actual knowledge of any wrongdoing or fraud. Nothing in the record shows that it did not take that paper in good faith. Because the Trust enjoys the status of a holder in due course, Deutsche Bank, as trustee, was not barred by the close relationship doctrine.

## C. Spurious Lien

██ ¶ 57 Finally, Samora contends that the trial court erred in concluding that the Deed of Trust was not a spurious document under section 38–35–201(3), C.R.S.2012. We reject this contention.

¶ 58 Section 38–35–201, C.R.S.2012 provides in relevant part:

(2) "Lien" means an encumbrance on real or personal property as security for the payment of a debt or performance of an obligation.

(3) "Spurious document" means any document that is forged or groundless, contains a material misstatement or false claim, or is otherwise patently invalid.

(4) "Spurious lien" means a purported lien or claim of lien that:

. . .

(b) Is not created, suffered, assumed, or agreed to by the owner of the property it purports to encumber....

¶ 59 "No spurious lien or spurious document shall hold or affect any real or personal property longer than thirty-five days after the lien or document has been recorded ...." § 38–35–203(1), C.R.S. 2012.

¶ 60 Under the spurious liens and documents statute, "when challenging a lien, the more specific provision—subsection (4)—should prevail over the more general provision—subsection (3)." *Tuscany, LLC v. W. States Excavating Pipe & Boring, LLC,* 128 P.3d 274, 278 (Colo.App.2005). A deed of trust is a lien. *See* § 38–35–201(2) ("'Lien' means an encumbrance on real ... property

as security for the payment of a debt ...."); § 38–39–201(1), C.R.S. 2012 ("[A]ny lien upon property created by a mortgage or deed of trust shall cease to be a lien fifteen years after the date on which the final payment or performance of the obligation secured thereby is due....").

¶ 61 In its written judgment, the trial court concluded that the Deed of Trust was not a spurious document because "it is undisputed that ... the ... Deed of Trust ... w[as] not forged."

¶ 62 We agree with Samora that this conclusion fails to address whether the Deed of Trust signed by Wasia contained "material misstatements" under the statutory definition of a spurious document. However, we further agree with Deutsche Bank that the Deed of Trust must be examined as a spurious lien under section 38–35–201(4), not as a spurious document. *See Tuscany, LLC*, 128 P.3d at 278; *Turkey Creek Ltd. Liab. Co. v.Anglo Am. Consol.Corp.*, 43 P.3d 701, 704 (Colo.App.2001) (analyzing deed of trust as spurious lien); *but see GMAC Mortg. Corp. v. PWI Grp.*, 155 P.3d 556, 558 (Colo.App. 2006) (analyzing deed of trust as spurious document).

¶ 63 A "spurious lien" is "a purported lien" "not created, suffered, assumed, or agreed to by the owner of the property it purports to encumber." § 38–35–201(4). Here, the evidence at trial established that Samora executed a voidable warranty deed in favor of Wasia. Thus, on September 20, 2004, when Wasia executed the Note and Deed of Trust in favor of Saxon Mortgage, she was the legal owner of the Property. Accordingly, the Deed of Trust is not a spurious lien, and Samora's contention must fail.

### III. Conclusion

¶ 64 The judgment is affirmed and the case is remanded to the trial court with directions to determine the amount of reasonable appellate attorney fees due to Saxon Mortgage.

JUDGE TAUBMAN and JUDGE HAWTHORNE concur.